# EXHIBIT "A"

Mark L. Lobaugh, M.D.

```
 1              UNITED STATES DISTRICT COURT
            SOUTHERN DISTRICT OF WEST VIRGINIA
 2                    AT CHARLESTON
 3    _____
 4    IN RE: ETHICON, INC.,      )  Master File No.
      PELVIC REPAIR SYSTEM       )  2:12-MD-02327
 5    PRODUCTS LIABILITY         )
      LITIGATION,                )  MDL No. 2327
 6                               )
                                 )  HON. JOSEPH R. GOODWIN,
 7                               )  U.S. DISTRICT JUDGE
      _____   )  _____
 8                               )
      REBECCA DALBERG, ET AL,    )
 9                               )
           Plaintiffs,           )
10                               )  Case No.: 2:13-cv-09725
      v.                         )
11                               )
      ETHICON, INC., ET AL.,     )
12                               )
           Defendants.           )
13    _____
14
15
16          ------------------------------------
17          ORAL AND VIDEOTAPED DEPOSITION OF
18                 MARK L. LOBAUGH, M.D.
19                 SEPTEMBER 26, 2018
20          ------------------------------------
21
22
23
24
```

Mark L. Lobaugh, M.D.

1          ORAL AND VIDEOTAPED DEPOSITION OF

2     MARK L. LOBAUGH, M.D., produced as a witness at

3     the instance of the Defendants, and duly sworn, was

4     taken in the above-styled and numbered cause on

5     September 26, 2018, from 1:24 p.m. to 4:45 p.m.,

6     before Karen L. D. Schoeve, CSR, RDR, CRR, in and

7     for the State of Texas, reported by computerized

8     machine shorthand, at the offices of 800 East

9     Central Texas Expressway, Harker Heights, Texas,

10    pursuant to the Federal Rules of Civil Procedure

11    and the procedures set forth In Re: Ethicon Inc.,

12    Pelvic Repair System Products Liability Litigation,

13    MDL No. 2327.

14        It is further agreed that Rule 30(b)(5) is

15    waived by agreement of the parties.

16

17

18

19

20

21

22

23

24

Mark L. Lobaugh, M.D.

```
 1                   A P P E A R A N C E S
 2   FOR THE PLAINTIFF:  (Appeared by videoconference)
 3        SEAN FARRELL, ESQUIRE
          KLINE & SPECTER, PC
 4        1525 Locust Street, 19th Floor
          Philadelphia, Pennsylvania 19102
 5        T:  215.772.1000
          F:  215.772.0397
 6        sean.farrell@klinespecter.com
 7
     FOR DEFENDANTS ETHICON, INC., AND JOHNSON & JOHNSON:
 8
          JEFFREY R. JOHNSON, ESQUIRE
 9        JRJ MEDIATION
          P.O. Box 3162
10        Edmonds, Washington 98020-3162
          T:  206.234.3289
11        jeff@jrjohnsonmediation.com
12
     FOR THE WITNESS:
13
          TERRI S. HARRIS, ESQUIRE
14        STEED DUNNILL REYNOLDS MURPHY LAMBERTH, LLP
          303 Camp Craft Road, Suite 350
15        Austin, Texas 78746
          T:  512.476.1094
16        F:  512.476.7770
          terriharris@steedlawfirm.com
17
18   ALSO PRESENT:
19        Jason Lemley, Videographer
20
     THE COURT REPORTER:
21
          Karen L. D. Schoeve
22        Certified Shorthand Reporter
          Certified Realtime Reporter
23        Registered Diplomate Reporter
          Realtime Systems Administrator
24
```

Mark L. Lobaugh, M.D.

```
 1                        INDEX

 2                                              PAGE

 3   Appearances                                 3

 4

 5   MARK L. LOBAUGH, M.D.

 6       Examination By Mr. Johnson              8

 7       Examination By Mr. Farrell             72

 8       Further Examination By Mr. Johnson    138

 9

10   Changes and Signature                     152

11   Reporter's Certificate                    154

12

13

14

15

16       REPORTER'S NOTE 1:  Please be advised that an

17   UNCERTIFIED ROUGH DRAFT version of this transcript

18   exists.  If you are in possession of said rough

19   draft, please replace it immediately with this

20   CERTIFIED FINAL TRANSCRIPT.

21

22       REPORTER'S NOTE 2:  Quotation marks are used for

23   clarity and do not necessarily reflect a direct

24   quote.
```

Mark L. Lobaugh, M.D.

```
 1                    EXHIBIT INDEX
 2   NO. DESCRIPTION                              PAGE
```

```
 3   Exhibit 1                                     15
          Third Amended Notice of Video Deposition
 4        (10 pages)
 5   Exhibit 2                                     15
          Curriculum Vitae
 6        (1 page)
 7   Exhibit 3                                     41
          Gynecare Prolift®, Surgeon's Resource
 8        Monograph, Approved 04/13/07,
          Marketing Services
 9        Bates stamped ETH.MESH.03460813 - 03460825
          Highly Confidential
10        Subject to Stipulation and Order of
          Confidentiality
11
     Exhibit 4                                     44
12        Potential Risks of Non-Mesh POP Surgery
          (1 page)
13
     Exhibit 5                                     45
14        Potential Risks of Non-Mesh and Mesh
          POP Surgeries
15        (1 page)
16   Exhibit 6                                     24
          Medical records from Metroplex Hospital,
17        dated 08/24/07
          Bates stamped
18        DALBERGR_LOBAU_MDR00004 - 5
19   Exhibit 7                                     56
          Disclosure and Consent, Medical and
20        Surgical Procedures, dated 08/24/07
          Bates stamped DALBERGR_PSR_00603 - 605
21
     Exhibit 8                                     67
22        Metroplex Hospital, Medical Records,
          dated 08/29/07
23        Bates stamped DALBERGR_PSR_00359 - 480
24
```

Mark L. Lobaugh, M.D.

```
 1                EXHIBIT INDEX (CONTINUED)
 2    NO. DESCRIPTION                              PAGE
 3    Exhibit 9                                      10
           Facility MET, Operative Report, date
 4         of surgery 08/29/07
           Bates stamped DALBERGR_PSR_00379 - 381
 5
      Exhibit 10                                    139
 6         Facility MET, Medical record,
           dated 08/29/07
 7         Bates stamped DALBERGR_PSR_00002
 8    Exhibit 11                                    140
           Facility MET, Medical record,
 9         dated 08/03/07
           Bates stamped DALBERGR_PSR_01584
10
11    Exhibit 12                                    140
           Metroplex, Discharge Reports,
12         dated 09/01/07
           Facility MET, Medical record,
13         dated 08/29/07
           Bates stamped DALBERGR_PSR_00357 - 358
14
      Exhibit 13                                    121
15         Gynecare Prolift® brochure
           Bates stamped ETH.MESH.02341522 - 02341527
16
      Exhibit 14                                    132
17         Pelvic Organ Prolapse brochure, Ethicon,
           Women's Health & Urology
18         Bates stamped ETH.MESH.03905976 - 03905991
19    Exhibit 15                                    137
           Letter dated 06/05/12 from Ethicon,
20         Piet Hinoul, M.D., Ph.D.,
           Medical Affairs Director
21         Bates stamped ETH.MESH.04568045
           Confidential
22         Subject to Stipulation and Order of
           Confidentiality
23
24
```

Mark L. Lobaugh, M.D.

```
 1             P R O C E E D I N G S

 2            (Deposition Exhibits 1 - 12

 3             referenced.)

 4            THE VIDEOGRAPHER:  We are now on the

 5  record.  My name is Jason Lemley.  I am a

 6  videographer for Golkow Litigation Services.

 7            Today's date is September 26th, 2018,

 8  and the time is 1:24.

 9            This video deposition is being held in

10  Harker Heights, Texas, in the matter of Rebecca

11  Dalberg versus Ethicon.

12            The deponent is Dr. Mike Lobo --

13  Lobaugh.

14            Will counsel please identify

15  themselves.

16            MR. FARRELL:  Good afternoon.  Sean

17  Farrell from Kline & Specter on behalf of

18  Mrs. Dalberg.

19            MR. JOHNSON:  Jeff Johnson

20  representing Ethicon and Johnson & Johnson.

21            MS. HARRIS:  And I'm Terri Harris here

22  and on behalf of Dr. Lobaugh.

23            THE VIDEOGRAPHER:  The court reporter

24  is Karen Schoeve, and will now swear in the witness.
```

Mark L. Lobaugh, M.D.

```
 1                MARK L. LOBAUGH, M.D.,

 2   having been first duly sworn to tell the truth, the

 3   whole truth, and nothing but the truth, so help him

 4   God, testified as follows:

 5                     EXAMINATION

 6   BY MR. JOHNSON:

 7        Q.   Good afternoon, Doctor.

 8             Would you state your complete name?

 9        A.   Mark Lobaugh.

10        Q.   Dr. Lobaugh, my name's Jeff Johnson.  I

11   represent Ethicon and Johnson & Johnson.  We were

12   just introduced right before the deposition started.

13             I'm going to ask you some questions

14   today.  If at any time I ask you a question you

15   don't understand or need me to clarify, can you let

16   me know that?

17        A.   Yes.

18        Q.   Could you just introduce yourself to the

19   jury, just say something about your professional

20   career and -- just so the jury can get acquainted

21   with you as a -- as a physician?

22        A.   Well, I attended medical school at Chicago

23   Medical School, and I graduated in 1982.

24             I did a year-and-a-half of internship
```

Mark L. Lobaugh, M.D.

1    in California at a UCLA affiliate program in

2    Bakersfield, California.  It was a general OB/GYN.

3                I left that program halfway through my

4    second year because I had an Air Force commitment,

5    so I fulfilled my four-year Air Force commitment as

6    a flight surgeon in Kansas in 198- -- starting 1988

7    until 1992.

8                In 1992, I entered -- reentered into

9    residency training at the University of Kansas and

10   completed my residency in OB/GYN in 1996.

11               I have had various practice locations.

12   I've been here in Texas now for about 15 years.

13        Q.   Thank you, Doctor.

14               My understanding is that you are one

15   of the treating doctors of the plaintiff in this

16   case, Rebecca Dalberg, and Ms. Dalberg has filed a

17   lawsuit against Ethicon and Johnson & Johnson.

18               Is that true that you're one of the

19   treating doctors?

20        A.   Yes.

21        Q.   Do you understand you are not a party to

22   this case, no one's claiming that you did anything

23   wrong?

24        A.   Yes.

Mark L. Lobaugh, M.D.

1     Q.   Doctor, have you had a chance to review

2   some records of your treatment of Ms. Dalberg?

3     A.   Yes.

4     Q.   My understanding is that you performed

5   surgery on Ms. Dalberg August 29, 2007; is that

6   right?

7     A.   Can I look at the record?

8     Q.   Sure.

9          (Deposition Exhibit 9 referenced.)

10    Q.   (BY MR. JOHNSON)  I think it's Exhibit

11   Number 9.

12    A.   (Examined exhibit.)  The date of operation

13   was August 29th, 2007.

14    Q.   And you might leave that out.  I'm going

15   to ask you a couple summary questions about that.

16          My understanding is that you performed

17   surgery for stress urinary incontinence; is that

18   right?

19    A.   Correct.

20    Q.   And you performed surgery for significant

21   bulging of her bladder, rectum, and intestines into

22   the vagina; is that correct?

23    A.   Yes.

24    Q.   Also, Doctor, just so the jury understands

Mark L. Lobaugh, M.D.

1    what surgeries you did, you used a mid-urethral

2    sling manufactured by Bard to treat the stress

3    urinary incontinence; is that right?

4         A.   According to the record, that is correct.

5         Q.   And is that a Urotech sling made of

6    polypropylene mesh?

7         A.   I don't remember that much detail, other

8    than the record says it was Bard, and so that's what

9    I would have used.

10        Q.   Well, we can -- if you take a look, I

11   believe it says in the record that it was a Urotech.

12        A.   (Examined exhibit.)

13        Q.   Well, just in looking at the second page

14   of the Operative Report, the last paragraph, it says

15   it was a "Bard transvaginal tape"; is that right?

16        A.   Correct.

17        Q.   And was that a polypropylene mesh tape?

18        A.   Yes.

19        Q.   And then the record also indicates that

20   you used Gynecare Prolift® mesh, manufactured by my

21   client, Ethicon, to treat significant bulging of the

22   bladder, rectum, and intestines into the vagina.

23        A.   Yes.

24        Q.   All right.  We don't -- as I am sitting

Mark L. Lobaugh, M.D.

1    here today, Doctor, we do not have records of

2    your -- from your clinic or your clinic chart.  It's

3    my understanding that they either don't exist or

4    they couldn't be found.

5              Could you tell the jury what the

6    status is of those records?

7         A.   Well, in the state of Texas we're required

8    to keep -- it's recommended we keep records for

9    seven years following any type of clinical exposure

10   or encounter.  And the seven years has long passed,

11   so we officially destroy the records after seven

12   years.

13        Q.   So those records no longer exist?

14        A.   Correct.

15        Q.   The records that we do have here that you

16   had a chance to look at pertain to your care and

17   treatment August 24 through September 1 of 2007, and

18   these are essentially hospital records; is that

19   right?

20        A.   Correct.

21        Q.   But there are some records that you have

22   handwritten notes on.

23        A.   Correct.

24        Q.   All right.  Doctor, Ms. Dalberg has

Mark L. Lobaugh, M.D.

1    brought this suit against Ethicon.

2              Did you tell her to sue Ethicon?

3        A.   No.

4        Q.   Have you ever told anyone that the

5    Gynecare Prolift® product made by Ethicon is

6    defective?

7        A.   No.

8        Q.   As you sit here today, do you have any

9    personal knowledge of Ms. Dalberg's current medical

10   condition?

11       A.   No.

12       Q.   Do you have any personal knowledge of her

13   medical course after September 1 of 2007?

14       A.   Yes.  Well, I don't have any records, but

15   I would've seen her for post-op follow-up after

16   that.

17       Q.   And my question is:  Do you have any

18   personal knowledge regarding those -- those post-op

19   follow-ups as you sit here today?

20       A.   No.

21       Q.   So the knowledge that you have relative

22   to her medical condition, care, and treatment will

23   be the records that we have here, Exhibits 6

24   through 12?

Mark L. Lobaugh, M.D.

1        A.    Correct.

2        Q.    All right.  I represent Ethicon and

3   Johnson & Johnson, and as counsel for the defendant,

4   I'm not allowed to talk with you until the time of

5   this deposition.

6                      Have we spoken before?

7        A.    No.

8        Q.    Have we ever spoken about Ms. Dalberg's

9   care and treatment?

10       A.    No.

11       Q.    Have you spoken to anyone from Ethicon or

12   Johnson & Johnson regarding her care and treatment?

13       A.    No.

14       Q.    Have you spoken to any of her attorneys

15   about her care and treatment?

16       A.    No.

17       Q.    Have you spoken to plaintiffs' counsel

18   about the care and treatment of Ms. Dalberg?

19       A.    No.

20       Q.    Have you spoken to Ms. Dalberg herself?

21       A.    No.

22       Q.    All right.  What did you do to prepare for

23   the deposition, Doctor?

24       A.    I reviewed the op report.

Mark L. Lobaugh, M.D.

1       Q.   And you've also had an opportunity to read

2   those records 6 through 12 --

3       A.   Yes.

4       Q.   -- is that correct?

5       A.   Yes.

6       Q.   And my understanding is you've brought a

7   curriculum vitae to the deposition; is that right?

8       A.   Correct.

9               (Deposition Exhibit 1 referenced.)

10      Q.   (BY MR. JOHNSON)  Would you just take a

11  look quickly at Exhibit Number 1?  And this was a

12  notice of deposition and subpoena for you to appear

13  at this deposition; is that right?

14      A.   Correct.

15      Q.   And in response to that, did you bring

16  anything other than your curriculum vitae?

17      A.   No.

18      Q.   Is that -- and that's because you don't

19  have anything else?

20      A.   Correct.

21      Q.   All right.  You can put Exhibit 1 away.

22  We won't come back to that.

23      A.   Okay.

24              (Deposition Exhibit 2 referenced.)

Mark L. Lobaugh, M.D.

1      Q.   (BY MR. JOHNSON)   Could you take a look at

2   Exhibit Number 2, Doctor?

3      A.   Okay.

4      Q.   Is that a true and correct copy of your

5   curriculum vitae which summarizes your professional

6   experience?

7      A.   Yes.

8      Q.   Is a curriculum vitae kind of a fancy word

9   for resumé?

10     A.   Correct.

11     Q.   All right.  My understanding is that

12   you're here to testify as a treating doctor; is that

13   right?

14     A.   Correct.

15     Q.   You have not been retained by Ethicon or

16   Johnson & Johnson to serve as an expert witness; is

17   that right?

18     A.   I have -- I have not, no.

19     Q.   And you've not been retained by plaintiffs

20   to serve as an expert witness?

21     A.   I have not.

22     Q.   You mentioned briefly your education.

23          Where did you go to college?

24     A.   My first year of undergraduate was at the

Mark L. Lobaugh, M.D.

1    University of Utah in Salt Lake City, and then -- I

2    spent one year there.

3              And then I went to San Joaquin Delta

4    College in Stockton, California, for two years.

5              And then I went to University of

6    California at Davis for three years, which is where

7    I graduated.

8              After that, I immediately entered

9    Chicago Medical School for medical school.

10       Q.   And did you graduate from medical school

11   in 1976 --

12       A.   No.

13       Q.   -- 1986?

14       A.   '86.

15       Q.   Looking at your CV, Exhibit 2, it says

16   that you were in medical school from 1972 to '76.

17              That should be '82 to '86; is that

18   right?

19       A.   Yes.

20       Q.   All right.  Then you started -- or you did

21   an OB -- an obstetrics and gynecology residency at

22   Kansas from '90 through -- '92 through '96?

23       A.   Yes.

24       Q.   Are you board certified?

Mark L. Lobaugh, M.D.

1        A.    Yes.

2        Q.    In what specialty?

3        A.    OB/GYN.

4        Q.    How long have you been certified in that

5   specialty?

6        A.    I was board certified in 1998, and have

7   been so ever since.

8        Q.    Doctor, are you licensed to practice

9   medicine in any states other than Texas?

10       A.    California.

11       Q.    I saw that somewhere, maybe it was on the

12   internet, that you are a retired lieutenant colonel

13   from the United States Air Force.

14       A.    From the United States Air Force

15   International Guard.

16       Q.    All right.  And I think you gave the jury

17   a little bit of information regarding -- regarding

18   your service or the timing of your service.

19            Could you just explain to the jury

20   your current practice?

21       A.    Currently, I'm in solo private practice

22   here in Texas, Harker Heights, Texas.  I've had a

23   solo private practice here for almost 15 -- about 15

24   years.

Mark L. Lobaugh, M.D.

```
 1          Q.   Can you tell the jury kind of the division

 2   of your current practice in terms of the types of

 3   medical conditions that you treat?

 4                    For instance, are you still doing

 5   obstetrics?

 6          A.   I'm still doing -- the majority of my

 7   practice is obstetrics.  General obstetrics,

 8   prenatal care, delivery, postnatal care.

 9                    I also do general gynecology, annual

10   exams, problems, and that does include surgical

11   procedures that I perform, hysterectomies,

12   laparoscopies, sterilization procedures.

13          Q.   Back in 2007, was the majority of your

14   practice in obstetrics at that time as well?

15          A.   Yes.

16          Q.   Has that been true pretty much throughout

17   your solo practice here in the last 15 years?

18          A.   It's kind of varied.  Back in 2007, I did

19   have a lot more gynecology than I do -- a lot

20   more -- significantly more gynecology than I do now.

21          Q.   About what percent currently do you spend

22   time treating patients for either stress urinary

23   incontinence or prolapse?

24          A.   It's a very small part of my practice now.
```

Mark L. Lobaugh, M.D.

1        Q.   How about in 2007, what --

2        A.   It --

3        Q.   -- what percentage was it?

4        A.   Probably 20 to 30 percent.  It was a very

5   large part of my practice back in 2007.

6        Q.   Is there any particular reason for the

7   change?

8        A.   The majority of my patients were referred

9   to me by a urologist who did not do female urology,

10   and that -- when that urologist left, I no longer

11   got the referrals.

12            A new urologist came in to town who

13   did female urology, so all those cases went to him.

14   So that's why my practice pretty much ended in

15   urogynecology at that point.

16        Q.   And when was that?

17        A.   That was probably, I'd have to say, around

18   2010, 2012 time frame.

19        Q.   All right.  Who was that new

20   urogynecol- -- or new --

21        A.   Urologist?

22        Q.   -- urologist?

23        A.   Dr. Morris.  Dr. Bernard Morris.

24        Q.   All right.  Doctor, we're gonna define

Mark L. Lobaugh, M.D.

1    some terms here for the jury.

2              Could you define "pelvic organ

3    prolapse," please.

4        A.   Pelvic organ prolapse can be defined as

5    the relaxation of the pelvic organs which include

6    the bladder, the uterus, and the rectum.

7              By "relaxation," the organs can drop

8    or fall out of the correct position that they

9    normally would be in.

10       Q.   There is a term used in the records that

11   we're gonna look at shortly and it's "pelvic

12   relaxation."

13             When you used that term in a medical

14   record, what did you -- what did you mean?

15       A.   It's kind of a generalized term for pelvic

16   prolapse to include -- may include or may not

17   include, but cystocele, uterine prolapse, or

18   rectocele.

19       Q.   Can you tell the jury what a cystocele is?

20       A.   A cystocele -- the way I like to describe

21   this to my patients is to think of the vagina as a

22   tube sock.

23             And the tube sock -- the bladder is a

24   ball that sits on a hammock above this tube sock,

Mark L. Lobaugh, M.D.

1   and when the hammock gets old or breaks or gets

2   loose, that ball drops through and bulges into the

3   tube sock or the vagina, and that's what a cystocele

4   is.

5        Q.   So that has to do with the bladder bulging

6   into the vagina?

7        A.   Correct.

8        Q.   And what is a rectocele?

9        A.   A rectocele, again, if you think of the

10  tube sock -- the vagina as a tube sock, the rectum

11  is a tube underneath the tube sock and there's a

12  tissue that acts as a tent that holds that rectum in

13  place.

14            When that tent gets loose, the rectum

15  bulges into the tube sock, and that's -- that

16  appears as a rectocele.

17       Q.   There's another term -- because I think

18  you fixed this in Ms. Dalberg -- "enterocele."

19            Can you tell the jury what that is?

20       A.   Yeah.  The -- if you look, again, at the

21  top of the tube sock, the intestine can actually

22  slide down underneath the bottom part of that tube

23  sock and form a bulge higher in the vagina, and that

24  would be an enterocele.

Mark L. Lobaugh, M.D.

1      Q.    How long have you been treating pelvic

2  organ prolapse and these conditions you just

3  mentioned?

4      A.    Since graduation from residency in 1996.

5      Q.    Is that when you -- was it during

6  residency that you first treated pelvic organ

7  prolapse or heard of that term?

8      A.    Well, we hear of it in medical school.

9  So, I mean, I -- we all know about that.  And I

10  graduated from medical school in 1986.

11           But to actually become involved in

12  treating it, I did -- I did treat in residency in

13  California.  At the California hospital we did do

14  that.

15           Again, I was only at that house --

16  that residency for a year-and-a-half.  So I didn't

17  use that training until after I finished the

18  residency at the University of Kansas, but . . .

19      Q.    Starting in 1996?

20      A.    1996 is when I really started treating it.

21      Q.    What are the causes of pelvic relaxation

22  or pelvic organ prolapse?

23      A.    It's the -- if you go back to my analogy,

24  the cystocele formation is when that hammock, for

Mark L. Lobaugh, M.D.

1   some reason, can no longer support the weight of the

2   ball, the bladder, and there could be a number of

3   reasons.

4                Number 1 is during vaginal deliveries

5   or childbirth, it stretches and potentially tears

6   and weakens that tissue.

7                The -- you can get cystoceles even if

8   you've never been pregnant before.  So there are

9   other mechanisms, but probably the most common is

10  vaginal deliveries.

11               Same thing with the -- with the

12  rectocele repair -- rectocele.  The -- when that

13  tent get- -- becomes weak, that tissue becomes

14  weakened or torn or damaged, then that allows for

15  the tent to become weak and the rectum to bulge into

16  the vagina and form the rectocele.

17               (Deposition Exhibit 6 referenced.)

18       Q.   (BY MR. JOHNSON)  And just looking at one

19  of the records for Ms. Dalberg, which I think is

20  Exhibit 6, the second page.

21       A.   (Examined exhibit.)  Okay.

22       Q.   Does that indicate her pregnancy -- you

23  know, how many -- how many pregnancies she had?

24       A.   (Examined exhibit.)

Mark L. Lobaugh, M.D.

1        Q.    Maybe it -- I saw that somewhere else.

2        A.    No.

3        Q.    But delivery is one of the -- the known

4    causes of pelvic relaxation, pelvic organ prolapse;

5    is that right?

6        A.    Yes.

7        Q.    Approximately how many patients have you

8    treated for pelvic organ prolapse, Doctor?

9        A.    In 2007?

10       Q.    Well, to date, first.

11       A.    Hundreds.  At least a couple hundred.

12       Q.    How about through 2007?

13       A.    Easily a hundred.  I mean, it's -- it was

14    a significant part of my practice.

15       Q.    Approximately how many patients have you

16    treated for stress urinary incontinence?

17       A.    At least a couple hundred, and that's very

18    conservative.  It's probably a lot more.

19       Q.    And how many by 2007?

20       A.    You know, at least over -- over a hundred.

21       Q.    Can you just define "stress urinary

22    incontinence" for the -- the jury?

23       A.    "Incontinence" is defined as leaking

24    urine, and there's two types of incontinence.

Mark L. Lobaugh, M.D.

1                    One is urge incontinence, and that's

2      where the bladder fills up and almost starts having

3      spasms so that the urge to go to the bathroom is

4      fairly quick, fairly sudden, and fairly severe.  In

5      other words, these patients feel like they have to

6      get to the bathroom or else they're gonna leak, and

7      that's urge incontinence.

8                    Stress incontinence is when the

9      bladder fills up, and when they do any kind of

10     stress such as jump, get on a trampoline, cough,

11     sneeze, the pressures are unevenly distributed and

12     result in leaking of urine in response to the

13     stress.

14          Q.   And my understanding is that you performed

15     surgery in August of 2007 on Ms. Dalberg for both

16     pelvic organ prolapse and stress urinary

17     incontinence?

18          A.   Yes.

19          Q.   You did not do surgery for urge

20     incontinence?

21          A.   No.  Urge incontinence is not a surgical

22     correction; it's a medical treatment.

23          Q.   When you start- -- first started treating

24     pelvic organ prolapse during your residency, was

Mark L. Lobaugh, M.D.

```
1    mesh available for use in those surgeries?

2         A.   No.

3         Q.   What did you learn as to the surgical

4    treatment of pelvic organ prolapse during your

5    residency?

6         A.   Let -- can I go back and . . .

7         Q.   Sure.

8         A.   The -- if you include stress urinary

9    incontinence as part of pelvic relaxation surgery,

10   the TVT® mesh was just beginning to become available

11   when I was a resident.

12             And I can't remember if I did any TVT®

13   cases as a resident, but I know I was getting

14   training in that through outside -- through courses

15   outside the residency.

16        Q.   And we'll get a little bit into the stress

17   urinary incontinence with my client who made the

18   product used in the -- in the pelvic organ prolapse

19   surgery you did, so I'm gonna focus more on that.

20        A.   Um-hum.

21        Q.   In terms of pelvic organ prolapse, what

22   surgical procedures were you taught during residency

23   for treatment of that?

24        A.   Going -- the anterior colporrhaphy and the
```

Mark L. Lobaugh, M.D.

1   posterior colporrhaphy were kind of the standard

2   treatments.

3        Q.   Can you tell the jury what those are?

4        A.   Going back to my tube sock analogy,

5   basically, you would make an incision in the top of

6   that tube sock.

7             You would open it up, try to expose

8   that hammock that's damaged, and you take some

9   stitches and you try to pull it together in trying

10  to reforce -- reinforce that hammock so that you

11  can -- the bladder would be basically placed back in

12  the proper position.

13            And then you'd close the incision in

14  the tube sock.

15       Q.   Were there risks and issues that arose

16  from that approach to fixing the tube sock, as it

17  were?

18       A.   We're not fixing the tube sock.  Fixing

19  the hammock.

20       Q.   Okay.  For fixing the hammock?

21       A.   Fixing the hammock.

22            Yeah.  Basically, you're trying to

23  take a tissue that's already damaged or already

24  weakened and trying to make it work.  And the

Mark L. Lobaugh, M.D.

 1  biggest problem with that procedure is failure.

 2  After a few years, the failure rates were pretty

 3  high.

 4       Q.   What does that mean, "pretty high"?

 5       A.   It means that the hammock became droopy

 6  again.

 7       Q.   No.  But I'm saying, what does that mean?

 8  In terms of it being a pretty high rate, what are

 9  you talking about?  Are we talking about 50 percent?

10  40 percent?

11       A.   I'm not sure of the exact number, but I

12  think it was right around the 50 percent after a

13  couple years.

14       Q.   Okay.  Eventually, synthetic mesh became

15  available for use during the pelvic organ prolapse

16  surgery; is that right?

17       A.   Yes.

18       Q.   Do you know approximately when that was?

19       A.   I know approximately when I started it.

20       Q.   And when did you start doing that?

21       A.   Well, my evolution into the synthetic mesh

22  was transitioned by using something called Pelvicol,

23  which was a porcine dermis, and ba- -- because the

24  basic idea is that why do you want to take already

Mark L. Lobaugh, M.D.

1    damaged tissue and try and make it -- repair it so

2    that it's going to function?  It's never going to be

3    anything but damaged tissue.  So, in other words,

4    that hammock is always going to be damaged tissue.

5              So the idea came, let's try something

6    different.  Let's try using something that can

7    actually replace the damaged tissue, and the porcine

8    dermis or the pig -- pig fascia was something that I

9    used initially, and I would stitch that in to try

10   to -- and then the theory or the goal was to have

11   the mom's tissue grow into that and replace it and

12   have a whole new hammock.  Rather than repairing the

13   bad -- or the old hammock, put in a new hammock.

14             So then it evolved to using the

15   synthetic meshes.  And I believe it was in France

16   where they first started this.  And so there was

17   some work done in France and was encouraging.

18             Again, the idea is that why you -- why

19   try to repair the damaged tissue that's making up

20   the hammock that's holding the bladder up?  Let's

21   get some new -- new type of hammock in there that's

22   gonna hold it in place and be done -- be done

23   forever, reduce the failure rate.

24        Q.   So you have per- -- you've performed a

Mark L. Lobaugh, M.D.

```
 1   number of these anterior colporrhaphies and

 2   posterior colporrhaphies using sutures,

 3   essentially --

 4        A.   Yeah.

 5        Q.   -- to try to repair the hammock, as you're

 6   saying?

 7        A.   That was -- that was the standard before

 8   all of these attempts came out, and that was -- that

 9   was the standard.  That's the way you did it.

10        Q.   Approximately how many of those surgeries

11   did you do?

12        A.   Probably a hundred as a resident.

13        Q.   And what was your experience in terms of

14   the success of those surgeries?

15        A.   Well, I think my success was just like

16   everybody else experiences.  I had a high failure

17   rate.

18        Q.   And then at what point in time were you

19   trying to use this Pelvicol porcine dermis, which is

20   the -- is pig dermis?

21        A.   Correct.

22        Q.   Pig skin, right?

23        A.   Um-hum.

24        Q.   When -- what was the time period you were
```

Mark L. Lobaugh, M.D.

1    trying that?

2        A.    I went to a course in Salt Lake City.   I

3    don't remember when it was, and I don't remember who

4    the physician was that was training us, but I'm

5    gonna say it was a couple years after residency, so

6    probably around '98.

7        Q.    How long did you use that as a potential

8    surgical technique for pelvic organ prolapse?

9        A.    Probably for three or four years.

10       Q.    What were your results using that?

11       A.    I thought it -- I thought it gave a very

12   good repair.

13       Q.    Did you think that that was an improvement

14   over the -- just the use of sutures in the anterior

15   colpo- -- colporrhaphy and posterior colporrhaphy?

16       A.    I did.

17              MR. FARRELL:   Objection to form.

18       Q.    (BY MR. JOHNSON)   Do you know who the

19   manufacturer of this porcine dermis was?

20       A.    It was called Pelvicol.  I'm not sure who

21   the manufacturer was.

22       Q.    All right.  Then you got some information

23   about use of synthetic meshes for the treatment of

24   pelvic organ prolapse.

Mark L. Lobaugh, M.D.

1                   Approximately when was that that you

2      first started using those meshes?

3           A.   I would have to say it was probably around

4      2000.  Somewhere around 2000.

5           Q.   And approximately how many of those -- how

6      many pelvic organ prolapse surgeries have you done

7      using mesh?

8           A.   Like I said, a couple hundred at least.

9           Q.   How did you learn how to use that, Doctor?

10          A.   The first course that I went through was

11     put on by Bard, and I went to the course and we did

12     cadaver labs.  It was a didactic session, talking

13     about the benefits, risks of the product, and then

14     there was instruction on -- on doing it using

15     cadaver labs.

16          Q.   I take it you went to that course before

17     you ever used mesh in -- in a surgery in a patient?

18          A.   Correct.

19          Q.   And so was the first mesh that you tried

20     for pelvic organ prolapse a mesh that was

21     manufactured by Bard?

22          A.   I'm not sure.  I can't answer that

23     question.

24          Q.   At some point in time, did you use

Mark L. Lobaugh, M.D.

1    Gynemesh™ manufactured by Ethicon for your pelvic

2    organ prolapse repairs?

3         A.   Yes.

4         Q.   Can you just tell the jury what Gynemesh™

5    is?

6         A.   It's another form of -- of mesh for --

7    used for pelvic relaxation.

8         Q.   And is that a polypropylene mesh?

9         A.   Yes.

10        Q.   Is the TVT®, the tension-free vaginal tape,

11   also a polypropylene mesh?

12        A.   I believe so, as far as I know.

13        Q.   What's the concept be- -- behind the use

14   of mesh for pelvic organ prolapse as opposed to just

15   sutures or -- or using, you know, pig dermis?

16        A.   They can --

17             MR. FARRELL:  Objection to form.

18        A.   The -- taking the tube sock model and

19   opening it up and trying to find that hammock, the

20   old-fashioned way or the traditionally method is to

21   put sutures in that already damaged tissue and try

22   and repair the hammock.

23             So the concept of using mesh is:  Why

24   do you want to try to repair something that's

Mark L. Lobaugh, M.D.

1   already torn and old and worn?  Let's put a new one

2   in, in the likelihood that it's gonna last and

3   continue to do -- give the support, is gonna be

4   higher than if you're just trying to repair the

5   torn, worn hammock.

6       Q.   (BY MR. JOHNSON)  When approximately did

7   you start using Gynemesh™, if you know?

8       A.   Well, I went to -- I went to a course with

9   Gynemesh™ and it was probably somewhere around 2006,

10  and when I -- and that was at Metroplex Hospital, I

11  believe were my first cases.

12           And I had a surgeon -- Gynecare

13  pro- -- provided this training.  But they had a

14  surgeon from Corpus Christi who was one of their

15  lead surgeons who came and proctored me on my first

16  three cases.

17      Q.   And who was that, if you recall?

18      A.   I don't recall the name.

19      Q.   Was that -- was that mesh -- the

20  Gynemesh™, was that the Prolift® system that you

21  were using at that point?

22      A.   I don't -- I'm not sure.  There -- there

23  were many different versions and improvements, and,

24  again, it's so long ago, and I'm not doing the

Mark L. Lobaugh, M.D.

1    surgery that I haven't really kept up on them.  But

2    I can't tell you exactly.

3         Q.   But during this time, between 2000 when

4    you had that course from Bard and the time that you

5    took the course at Metroplex Hospital that -- that

6    was sponsored by Ethicon, during that six-year time

7    period, you were still putting mesh in for pelvic

8    organ prolapse; is that right?

9         A.   Well, let me just clarify.  The course was

10   not at Metroplex.

11        Q.   Oh.

12        A.   The surgeon came and proctored me at

13   Metroplex --

14        Q.   Oh, okay.

15        A.   -- which was my hospital.

16             The course was somewhere else, and I

17   don't remember where that was.

18             And I had -- I would -- hadn't done

19   many mesh cases between the time I went to Bard.  In

20   fact, I'm not sure that I did any.  I may have done

21   a couple in my -- my original practice before I came

22   to Texas, but with the assistance or direction of

23   other surgeons.

24             So it wasn't until I really got to

Mark L. Lobaugh, M.D.

1    Metroplex in 2006 that I started doing the -- the

2    synthetic meshes on a full-time basis.

3         Q.   For pelvic organ prolapse?

4         A.   Yes.

5         Q.   What about for stress urinary

6    incontinence?  What was your experience after

7    residency in using tension-free vaginal tape, the

8    synthetic mesh, for stress urinary incontinence?

9         A.   I'd -- I'd have to say that really my use

10   of -- of the tension-free tape really started about

11   the same time.

12              Prior to that, one of the procedure

13   that I was using for stress urinary incontinence was

14   probably a laparoscopic Burch, which is using --

15   again, it's using a mesh, but it's a laparoscopic

16   procedure.

17        Q.   And was that -- that was using mesh or was

18   that using super -- sutures, the Burch?

19        A.   Mesh.  Mesh.

20        Q.   And what kind of mesh?

21        A.   I don't remember the name of it.

22        Q.   All right.  Doctor, just in looking at the

23   record, we see that you put in a Proli- -- a

24   Gynecare mesh with a Prolift® system that was

Mark L. Lobaugh, M.D.

1    manufactured by Ethicon; is that right?

2         A.   Look at the -- according to the record,

3    yes.

4         Q.   Right.

5              What was the reason that you decided

6    to use that for treatment of Ms. Dalberg?

7         A.   At that time that was the mesh that I was

8    using because I felt like it was the one that was

9    most available to me.  It was the one that I had the

10   most training in, and it -- so really, it was the

11   only mesh that I was using at that point.

12        Q.   How many times had you put Gynemesh™

13   Prolift into patients prior to Ms. Dalberg in late

14   August 2007?

15        A.   I don't -- I don't have any way to know

16   that number.

17        Q.   What was the reason that you used the Bard

18   Urotech --

19              MR. FARRELL:  I'm sorry.  Can you

20   repeat?  The doctor blipped out.

21              Could you repeat the answer, please?

22              THE WITNESS:  I don't have any idea

23   what that number is.

24              MR. FARRELL:  Okay.  Thank you.

Mark L. Lobaugh, M.D.

1      Q.   (BY MR. JOHNSON)   And what was the reason

2   that you used the Bard Urotech sling in treating

3   this stress urinary incontinence in 2007?

4      A.   Just a preference of the delivery method.

5      Q.   All right.  Doctor, just going back to

6   your training from Ethicon, did you per- -- did you

7   go to any professional education events that were

8   sponsored by Ethicon?

9      A.   Yes.

10      Q.   Did you go to any professional education

11   events sponsored by other manufacturers?

12      A.   Yes.

13      Q.   Which ones?

14      A.   Boston Scientific.  Was it ASI?

15      Q.   AMS?

16      A.   Or AMS.  And the --

17      Q.   I think you already mentioned Bard.

18      A.   Bard.  AMS, Ethicon.

19            And what was the other one?  There's

20   one other one.

21      Q.   Boston Scientific?

22      A.   The -- yeah.

23      Q.   All right.  When you attended the Ethicon

24   professional education events, did you find those to

Mark L. Lobaugh, M.D.

1   be helpful?

2       A.   I found all of them to be helpful.

3       Q.   What do you remember about any Ethicon

4   professional education events, if anything?

5       A.   Nothing specific.

6       Q.   Can you give me an idea or the jury an

7   idea of kind of how you learned at those Ethicon

8   events?

9       A.   There was a didactic session where they

10  had professors giving slide presentations on the

11  scientific background as well as proper procedures

12  for using the product.

13           And then after that, there was always

14  a practical lab or we would use cadavers to try --

15  or to practice on.

16      Q.   Did you form any opinions as to whether or

17  not the professional education events put on by

18  Ethicon improved your professional competence?

19      A.   Yes.

20           MR. FARRELL:  Objection to form.

21      Q.   (BY MR. JOHNSON)  In what way did they

22  improve your professional content -- competence?

23      A.   Increased my knowledge.

24           Just being able to be with the

Mark L. Lobaugh, M.D.

```
 1   professional colleagues, discussing everybody's

 2   experience.

 3            Picking up little, different ideas on

 4   how something worked for somebody, and that's a good

 5   idea, so I'm gonna try that.

 6            And -- and then just having the

 7   experienced surgeons kind of walk you through the

 8   insertion techniques on the cadavers.

 9   Q.   So these people you were learning from

10   were surgeons; is that right?

11   A.   Yes.

12   Q.   You've mentioned that there was didactic

13   training, which is lectures?

14   A.   Yes.

15   Q.   Did those lectures talk about potential

16   risks of the surgeries?

17   A.   Yes.

18            (Deposition Exhibit 3 referenced.)

19   Q.   (BY MR. JOHNSON)  Doctor, if you could

20   take a look at Exhibit Number 3, please.  This is a

21   Surgeon's Resource Monograph for the Prolift® Pelvic

22   Floor Repair System.

23            And if you could just take a look at

24   that and let me know whether or not this is
```

Mark L. Lobaugh, M.D.

1    something that you probably received a copy of

2    during your training?

3         A.   (Examined exhibit.)

4         Q.   Or even after your training?

5         A.   (Examined exhibit.)  It doesn't look

6    familiar.

7         Q.   All right.  Could you take a look at

8    page 7 of Exhibit Number 3.

9         A.   Okay.

10        Q.   There is a list in the middle of the page

11   of various complications that might be associated

12   with the use of the Prolift® system for pelvic organ

13   prolapse surgery.

14             Could you just take a look at those

15   lists and indicate whether or not you were aware of

16   those risks at the time that you treated

17   Ms. Dalberg?

18        A.   Yes.

19        Q.   Could you just read slowly for the jury

20   what those complications were that are -- that are

21   in this Exhibit Number 3 that you were aware of as

22   of August 2007?

23        A.   "Postop- -- Postoperative.  Hemorrhage,

24   Hematoma, Fistula, Infection, Urinary Retention,

Mark L. Lobaugh, M.D.

1    Mesh Exposure, Mesh Erosion, Dyspareunia, Vaginal

2    Pain."

3        Q.   And then what about intra-operative

4    complications?

5        A.   Intra-operative complications,

6    "Hemorrhage, Visceral Injury, Ureteral Obstruction."

7        Q.   Where did you get the information

8    regarding those potential complications?

9        A.   In residency.

10       Q.   And then did you also -- any other sources

11   of information as to those complications?

12       A.   Well, I mean, there's plenty of sources.

13   There's lots of sources.

14            I mean, these are so commonly known

15   that -- I mean, that's -- this is just part of the

16   risk of the surgery.

17       Q.   And my understanding -- and we're gonna

18   look at the consent form later --

19       A.   Uh-huh.

20       Q.   -- is that there are additional risks that

21   you were aware of as well; is that right?

22       A.   Yeah.  I mean, I don't see nerve injury on

23   here.  That was something that I'd usually talk to

24   them about.

Mark L. Lobaugh, M.D.

1        Q.   And we'll go through the consent form,

2   which -- which discusses a number of different

3   risks.

4                 MR. JOHNSON:   Can we go off the

5   record?

6                 THE VIDEOGRAPHER:   Going off the

7   record.   The time is 2:07.

8                 (A recess was taken from 2:07 p.m. to

9                  2:14 p.m.)

10                THE VIDEOGRAPHER:   Back on the record.

11   Time is 2:14.

12                (Deposition Exhibit 4 referenced.)

13        Q.   (BY MR. JOHNSON)   Doctor, could you take a

14   look at Exhibit Number 4, please.

15        A.   Okay.

16        Q.   And this is a chart of Potential Risks of

17   Non-mesh Pelvic Organ Prolapse Surgery.

18                Could you just take a look at that

19   list and tell me whether or not as of August 2007,

20   you were aware of the risks of non-mesh pelvic organ

21   prolapse surgery that are identified on Exhibit 4?

22        A.   (Examined exhibit.)   Yes.

23        Q.   Where did you get that knowledge?

24        A.   Residency.

Mark L. Lobaugh, M.D.

1       Q.   Were you aware that those risks set forth

2   on Exhibit 4 could be either temporary or chronic?

3       A.   Yes.

4       Q.   Were aware that the risks set forth on

5   Exhibit 4 could be either mild, moderate, or severe?

6       A.   Yes.

7       Q.   Where did you get that knowledge?

8       A.   Again, from residency training.

9            (Deposition Exhibit 5 referenced.)

10      Q.   (BY MR. JOHNSON)  Doctor, if you could

11  take a look at Exhibit Number 5, and I'll represent

12  to you that the left-hand of Exhibit Number 5 is the

13  same as what's on Exhibit Number 4, and the

14  right-hand side has to do with potential risks of

15  mesh pelvic organ prolapse surgeries.

16           Could you look at that list and tell

17  me whether or not as of August 2007, you were aware

18  of those risks on the Mesh side of Exhibit Number 5?

19      A.   (Examined exhibit.)  Yes.

20      Q.   Were you aware -- or -- and what was the

21  source of that knowledge?

22      A.   From the training courses as well as

23  reading the literature.

24           And the mesh surgery is an anterior

Mark L. Lobaugh, M.D.

1    repair.

2         Q.   Is a what?

3         A.   It's an anterior repair.  It's the same --

4    it's the same procedure as it was done

5    traditionally, just with a different method.

6              So any risk that was present not using

7    mesh could also potentially be present using mesh.

8         Q.   And were there some other potential risks

9    involving using mesh that you learned as well such

10   as the erosion or exposure?

11        A.   Yes.  And that was probably the one

12   complication which was greater or the one that I

13   emphasized the most to the patients is the potential

14   for erosion of the mesh which could potentially

15   require additional surgeries.

16        Q.   And we'll go through your consent form.

17             As of August 2007, were you aware that

18   the risks set forth on Exhibit Number 5 pertaining

19   to mesh pelvic organ prolapse surgeries could be

20   acute or chronic?

21        A.   Yes.

22        Q.   Were you aware they could be mild,

23   moderate, or severe?

24        A.   Yes.

Mark L. Lobaugh, M.D.

1       Q.   Doctor, you had an opportunity to -- I'm

2  gonna change subjects.

3            You had an opportunity to treat

4  Ms. Dalberg; is that right?

5       A.   Yes.

6       Q.   And you have -- there's a record.  It's

7  Exhibit Number 6.

8            Could you just take a look at that and

9  just tell the jury what Exhibit Number 6 is?

10      A.   This is my preoperative history and

11  physical.

12      Q.   Whose handwriting is on this?

13      A.   Some of it's mine and some of it's

14  probably my medical assistant.

15      Q.   It looks like the -- the name, Rebecca

16  Dalberg, the date, the height and weight and blood

17  pressure, looks like to be in a different

18  handwriting than everything else.

19      A.   Yes.  Well, I think under Previous

20  Surgeries that was -- I think that might be the

21  same.

22      Q.   Okay.  In any event, could you just go

23  through quickly, because I can't read all of these

24  things, and just tell the jury what -- what is set

Mark L. Lobaugh, M.D.

 1   forth on page 1 of Exhibit Number 6?

 2        A.   Could you repeat the question?

 3        Q.   Sure.  Could you just go through --

 4   there's handwriting.  I can't read it all.

 5             Can you just go through and indicate

 6   what is on this form?

 7        A.   Well, the patient -- patient's name.

 8             The Primary Care Physician, she didn't

 9   have one.  We don't have the -- or we just didn't

10   fill it in.

11             The Identifying Data, she's a

12   59-year-old.

13             Chief Complaint, we didn't fill that

14   in because we knew it was pelvic organ prolapse.

15             The History, she had a previous

16   bladder surgery in 1996.

17        Q.   And you're looking at page 2 of Exhibit 6

18   right now?

19        A.   Oh, correct.  That's correct.

20        Q.   Okay.  Anyway, go -- why don't you go

21   ahead and continue.

22        A.   Had the incontinence at that time.

23             Continues to have stress urinary

24   incontinence.

Mark L. Lobaugh, M.D.

```
 1                    The leak point pressure was 66.

 2                    She had a low urethral -- UPP, which

 3   is urethral pressure profile, and that's all done on

 4   urodynamic testing in my office.

 5        Q.   I have one question about that.

 6                    Under History, does it say "had to

 7   repair cystocele"?

 8        A.   Yes.

 9        Q.   And that's why she had the bladder surgery

10   in 1996, according to this history?

11        A.   Yes.

12        Q.   All right.  Go ahead.

13        A.   "Past Medical History or Past Medical

14   Problems:  Hypertension, SLE, headache.

15                    "Medications:  See the list."  So

16   there was another list that she had with her record.

17                    "Over the Counter Prescriptions:

18   None.

19                    "Previous Surgeries," she had a

20   cholecystectomy, an exploratory laparotomy, an

21   appendectomy.  She had a hysterectomy with BSO.  I

22   can't --

23        Q.   Is that "tonsil"?

24        A.   "Tonsil," I guess.
```

Mark L. Lobaugh, M.D.

1              Next one's "carpal tunnel."  She had

2    four vaginal deliveries, one knee surgery.

3              Allergies, she's allergic to vitamin

4    C, E, aloe vera.  I can't see what the next allergy

5    is.

6              Her Gynecol- -- "Gynecological

7    History:  Last PAP" -- well, she had a hysterectomy,

8    so she didn't have a PAP.

9              Her mammogram was a year ago.

10             She's not on any contraception.

11             Then the Review of Systems all were

12   checked "negative."

13        Q.   All right.  And so there is a reference

14   under Previous Surgeries to her delivering four

15   children; is that right?

16        A.   Yes.

17        Q.   What tests did you do to determine in your

18   office that she had stress urinary incontinence and

19   this LPP of 66 and low VPP?

20        A.   We did urodynamic testing in my office,

21   and that's using a -- a machine where -- place a

22   catheter in the bladder, one in the rectum.

23             We fill the bladder up with fluid and

24   measure pressures, have the patient cough, strain

Mark L. Lobaugh, M.D.

1    and void, and then we can measure the pressures in

2    the urethra, and it sort of gives us an idea of the

3    function of the urethra and if they're a candidate

4    for a mid-urethral sling.

5         Q.   And based on what you have in this note,

6    was she a candidate for a mid-urethral sling?

7         A.   Yes.

8         Q.   What significance, if any, was the fact

9    that she had had previous bladder surgery to repair

10   a cystocele?

11        A.   That is signi- -- significant because she

12   had the previous traditional approach trying to use

13   the -- her own tissue, her own hammock to repair

14   this dropping bladder, and it failed.

15        Q.   And why was that significant to you?

16        A.   Because that -- to me, that told me that

17   it didn't work, so she needed something else.

18        Q.   Did that play any role -- or strike that.

19             Did the fact that she had the prior

20   failed surgery play any role in the decision-making

21   process to use mesh for the pelvic organ prolapse?

22        A.   At this point, all of my anterior repairs

23   were being done with mesh.  So I'd have to say no,

24   it didn't play any role.

Mark L. Lobaugh, M.D.

1      Q.   But that was -- would that have any impact

2   on whether or not mesh was indicated?

3      A.   No.

4      Q.   No.

5              Because you were gonna use it anyway?

6      A.   Right.

7      Q.   And what was the reason you were going to

8   use it anyway?

9      A.   I just believed it was a better approach

10  to not try to repair damaged tissue because it was

11  probably not gonna work, and in my opinion, trying

12  to replace that hammock was something that was gonna

13  be stronger and longer lasting, forever lasting was

14  a better approach.

15     Q.   Doctor, when you used the Gynemesh™

16  Prolift System for the pelvic organ prolapse, at

17  that time did you believe that that was the approach

18  that gave you the best chance of success for your

19  patient?

20     A.   Yes.

21     Q.   All right.  Could we take a look -- let me

22  ask you some questions about informed consent, and

23  I'm gonna get to your consent form, Exhibit

24  Number 7, but let me just ask you.

Mark L. Lobaugh, M.D.

 1                    Can you just tell the jury what the

 2    concept of informed consent means?

 3         A.   The patient needs to have all the

 4    information available, or as much as possible, to

 5    allow them to make the decision that is best for

 6    them.  And so what we try to do is we try to

 7    describe the procedure that we're recommending.

 8                    That's why I use my tube sock analogy,

 9    tent, hammock.  You know, people can understand that

10    stuff.

11                    And then once we describe the

12    procedure, we tell them the benefits of the

13    procedure, how this will help them, or how this

14    might help them, but we also give them the risks of

15    the procedure, the things that may not necessarily

16    be desired such as failure, another surgery,

17    erosion, for example.

18                    And so the patient has to really make

19    that decision on what's gonna be the best course of

20    treatment for them.

21         Q.   Would it be fair to say that you discussed

22    the alternatives, benefits, and material risks with

23    Ms. Dalberg before her surgery?

24         A.   Yes.

Mark L. Lobaugh, M.D.

1          Q.   Is providing an --

2                MR. FARRELL:   Objection; form.

3          Q.   (BY MR. JOHNSON)   Is providing an informed

4     consent required under Texas law?

5          A.   Yes.

6          Q.   Doctor, in 2007, what was your approach to

7     make sure a patient was able to make an informed

8     decision?

9          A.   Just to talk to them.   Talk to them and

10    then describe all the risks and benefits.

11                    Ask them if they understood.

12                    Ask them if they had any questions.

13                    And, you know, again, describe the

14    condition that they have.

15                    Describe the procedure or the options.

16                    (Phone interruption.)

17         A.   Describe the options that are available,

18    and then try to describe the procedure as best I

19    can.

20                    And then talk about the benefits and

21    also talk about the potential risks.

22         Q.   (BY MR. JOHNSON)   Did your -- did you do

23    the informed consent discussion yourself?

24         A.   Yes.

Mark L. Lobaugh, M.D.

1      Q.   Did you ever have your staff involved in

2  that?

3      A.   In the discussion?

4      Q.   Right.

5      A.   No.

6      Q.   Did you have videos for your patients at

7  all?

8      A.   No -- oh, videos?  Yes.

9           Educational videos?

10     Q.   Yeah, for the patients to look at before a

11  surgery like this?

12     A.   We -- we did have some.  Not too many of

13  the patients really took us up on it.

14     Q.   Do you know whether or not in this case a

15  video would have been made available to Ms. Dalberg

16  if she had wanted to review it?

17     A.   I do not know.

18     Q.   Did you have any handouts that you

19  provided to patients --

20           MR. FARRELL:  I'm sorry.  What was the

21  Doctor's answer, please?  It blipped out.

22           MR. JOHNSON:  He did not know.  He did

23  not know, Sean.

24           MR. FARRELL:  Thank you.

Mark L. Lobaugh, M.D.

 1        Q.    (BY MR. JOHNSON)   Did you have any

 2   handouts, either company, ACOG, or other handouts

 3   regarding pelvic organ prolapse for patients?

 4        A.    I don't remember.

 5                    (Deposition Exhibit 7 referenced.)

 6        Q.    (BY MR. JOHNSON)   Could you take a look at

 7   Exhibit Number 7, Doctor, and can you tell the jury

 8   what Exhibit Number 7 is?

 9        A.    (Examined exhibit.)   That's a Disclosure

10   and Consent Medical and Surgical Procedures.

11        Q.    That's the first -- the first page.

12                    What are the next two pages?

13        A.    Pelvic Reconstruction Consent.

14        Q.    What is the reason that you had two

15   separate consent forms for Ms. Dalberg in this

16   particular situation?

17        A.    The first one is the Texas Medical

18   Disclosure Panel's form.   So that was the State of

19   Texas form.

20        Q.    And what was -- what are the last two

21   pages?

22        A.    The last two pages are my form.

23                    So I tailored this to my discussion

24   and how I -- I discussed with the patient.

Mark L. Lobaugh, M.D.

1        Q.    For purposes of -- well, strike that.

2               So how -- can you just tell me the

3    process by which this form -- both of these forms

4    would be provided to Ms. Dalberg, and what process

5    would go -- she would go through before signing?

6        A.    When the patient would come for the pre-op

7    appointment -- this -- this -- now, there is some

8    variability to this, but this is pretty much the

9    standard.

10              The patient would come for the pre-op

11   before surgery and we would sit down and review

12   everything that had already been talked about and

13   discuss the procedure, discuss the risks, the

14   benefits.

15              And if the patient had no more

16   questions, then the medical assistant would come

17   with the consent, have her read the sent -- consent,

18   and sign it.

19       Q.    Would you actually go through these forms

20   with -- would you have gone through -- strike that.

21              Would you have gone through these

22   forms with Ms. Dalberg?

23       A.    I don't take the form in and go in --

24   in -- through the form.  But in my discussion, I

Mark L. Lobaugh, M.D.

1    cover all these bullet points.

2         Q.   All right.

3         A.   And then the patient is asked to read it

4    over and sign it.

5         Q.   And we see that the surgery was

6    August 29th.

7                   And the History and Physical that you

8    did, which is Exhibit 6, was August 24th, 2007; is

9    that right?

10        A.   Yes.

11        Q.   And looking at the bottom of the first

12   page of Exhibit Number 7, which are the consent

13   forms, is there a date?

14        A.   There is not a date.

15        Q.   Well, on the -- on the first page of

16   the -- the front page of Exhibit 7, is there a date?

17        A.   That one is dated August 24th.

18        Q.   And she signed that; is that correct?

19        A.   Yes.

20        Q.   Would the -- would she receive both the

21   top page, the Texas medical consent form, and the

22   back two pages, the Pelvic Reconstruction Consent

23   forms, on the same day for signature?

24        A.   Usually not.

Mark L. Lobaugh, M.D.

1      Q.   Can you tell me -- or can you tell from

2   the information we have when she signed the Pelvic

3   Reconstruction Consent form?

4      A.   The Texas form would be -- would be signed

5   at the hospital on the day of surgery, and the -- my

6   form would have been signed in the office at the day

7   of the pre-op.

8      Q.   And based on looking at this, it appears

9   that the Texas form was actually signed on the day

10   of the pre-op as well; is that right?

11      A.   Apparently so, yes.

12      Q.   All right.  And in terms of the date when

13   she would have signed your form, based on your

14   normal custom and practice -- or ordinary custom and

15   practice, would that form have been signed on

16   August 24, 2007?

17      A.   Yeah, and I must say that --

18           MR. FARRELL:  Objection; form.

19      A.   -- this is the way that we're doing the

20   consents now.

21           Back in 2007, we may have actually had

22   them sign the Texas form and my form at the same

23   time because that was a different hospital than what

24   I'm practicing now.

Mark L. Lobaugh, M.D.

1               And just trying to think about this,

2     they may have actually provided these Texas forms

3     for our office to get before they came to surgery.

4     So that's possibly why the dates are different.

5          Q.   (BY MR. JOHNSON)   All right.   I guess my

6     question is:   Based on your ordinary custom and

7     practice, is it likely that Ms. Dalberg signed the

8     Pelvic Reconstruction Consent form on August 24,

9     2007?

10         A.   Yeah -- was that the pre-op date?

11         Q.   Yes.

12              MR. FARRELL:   Objection; form.

13         A.   Yes.

14         Q.   (BY MR. JOHNSON)   And why is -- why is

15    that likely?

16         A.   Because that's when we had -- that's when

17    we reviewed all the risks and benefits, reviewed the

18    procedure, and that's when we got the consents

19    signed.

20         Q.   So just taking a look at your Pelvic

21    Reconstruction Consent form, which is the last two

22    pages of Exhibit 7, Doctor, it appears that you

23    provided her with a -- information regarding risks;

24    is that right?

Mark L. Lobaugh, M.D.

1      A.   Yes.

2      Q.   And the risks of the surgery and also

3   risks of using the graft material, either the T- --

4   either the tension-free tape or the sling or the

5   pelvic mesh for the pelvic organ prolapse; is that

6   right?

7      A.   That's correct.

8      Q.   Okay.  Can you tell the jury what the

9   risks were that you described to Ms. Dalberg prior

10  to her surgery based on your ordinary custom and

11  practice in August of 2007?

12     A.   Anytime you have surgery --

13          MR. FARRELL:  Objection; form.

14     A.   Anytime you have surgery, there's risk --

15  risk of infection, bleeding, injury to the bowel,

16  bladder, nerves, ureters.

17          Anytime you have this type of surgery,

18  the biggest concern that I have is there could be

19  potential erosion of the mesh -- mesh through the --

20  through the vaginal skin, and if that were to

21  happen, the -- an additional procedure would have to

22  be performed in order to address -- address the

23  erosion.

24          Anytime you have this surgery, there's

Mark L. Lobaugh, M.D.

1    a potential for scarring which cause -- could cause

2    pain, particularly with intercourse, and these are

3    all conditions that would have to be potentially

4    addressed after post-op recovery time pain.

5        Q.    (BY MR. JOHNSON)  And did you have any

6    discussion regarding potential urinary symptoms,

7    incontinence or retention?

8        A.    Well, specific- -- whenever I do a sling,

9    I always tell them that there is a possibility that

10   you may not be able to empty your bladder.  You may

11   have some -- some urinary retention.  It's usually

12   temporary.  It's very unusual for it to be

13   permanent, and if something like that happens,

14   usually you have to wear a catheter.

15             And I also -- again, I always -- I

16   already mentioned the injury to the bowel, bladder,

17   or ureter nerves.  And if there is a bladder injury,

18   you'll have to have a catheter for an extra -- a

19   week or two.

20       Q.    Just in looking at this form, Exhibit 7,

21   and the risks, there's a statement here -- and it's

22   the fifth bullet point down -- that there could be

23   "Allergy or sensitivity to the graft material

24   resulting in your body rejecting the graft.  This

Mark L. Lobaugh, M.D.

1    may necessitate an additional surgery to remove the

2    graft and repair any defect that results from the

3    graft material."

4              What would you have told Ms. Dalberg

5    about that?

6         A.   Well, I usually just discuss the erosion

7    and include that as part of the erosion, that the --

8    the graft may potentially be exposed and it'll have

9    to be fixed, potentially removed.

10        Q.   Looking at the next bullet point, it says

11   that, quote -- well, strike.

12             The next bullet point says, "Infection

13   of the graft material may require removal of the

14   graft material.  Additional surgery may be needed to

15   correct a defect caused by the removal of the graft

16   material."

17             Is that information that you provided

18   to her as well?

19        A.   I'm not sure if I specifically provided

20   that.

21             I really didn't find infection of the

22   graft to be a very common thing.  I -- I didn't

23   think I ever had one that was infected.

24        Q.   You don't think that's something that you

Mark L. Lobaugh, M.D.

1   emphasized?

2       A.   Probably not.

3       Q.   But she obviously had that information

4   from the form itself?

5       A.   Yes.

6            And, again, I -- I briefly talk about

7   infection as an overall potential complication.  So

8   I -- I include that as -- within that overall scope

9   of possible infection.

10      Q.   Then the next bullet point says,

11  "Occasionally the graft may erode through the

12  adjacent tissue requiring additional surgery to

13  repair the erosion.  Rarely the graft will need to

14  be removed."

15           And I think that's what you've said

16  you've already discussed with her?

17      A.   Yeah.

18      Q.   Or that you would have discussed with her

19  for sure?

20      A.   Yes.

21      Q.   And then two more bullet points down, it

22  says, "Reduction of loss of ability to control flow

23  of urine, urinary incontinence."

24           Is that something that you as part of

Mark L. Lobaugh, M.D.

```
1    your actual verbal discussion would talk about

2    with -- with -- would've talked about with

3    Ms. Dalberg?

4         A.   Well, she already had incontinence.

5              So we were talking about -- more about

6    the repair in correcting the incontinence and that

7    the possibility that the repair may not work.

8    Although it was 85 percent effective, there was

9    still 15 percent that it was not gonna work.

10        Q.   And so the final bullet point there is,

11   "Your condition may not be cured and may recur."

12        A.   Yes.

13        Q.   Is that something you discussed with her?

14        A.   Well, like I just said, there's a

15   15 percent failure rate in -- in sling.  Proce- --

16   in mid-urethral sling procedures, so there's --

17   there's always that possibility that the surgery is

18   not gonna correct the problem.

19        Q.   Was it your practice at that time to give

20   the patient an opportunity to ask any questions?

21        A.   Oh, yes.  Yeah, we always -- we had an

22   open -- open dialogue.  They could ask whatever

23   question they wanted to.

24        Q.   What would be the reason that you'd have
```

Mark L. Lobaugh, M.D.

1    the consent form signed on August 24th, five days

2    before the surgery?

3        A.   Well, we try to do it at the pre-op

4    appointment, because that's -- you know, that's

5    their last shot at really trying to get the major

6    opportunity to answer their questions.

7              They can ask -- answer -- I always see

8    them in pre-op and ask them, "Well, do you have any

9    more questions?  Is there anything else you want to

10   ask?"

11             But really, the final discussion is at

12   the pre-op appointment.

13       Q.   Dr. Lobaugh, do you have an opinion to a

14   reasonable degree of medical certainty as to whether

15   or not you provided an informed consent to

16   Ms. Dalberg?

17       A.   I have no uncertainty.  I'm -- I'm --

18             MR. FARRELL:  Objection to form.

19       A.   -- convinced that I provide informed

20   consent to all my procedures.

21       Q.   (BY MR. JOHNSON)  Yeah.

22             How would you just -- how would you

23   characterize your consent, robust, or in some other

24   way?

Mark L. Lobaugh, M.D.

1              MR. FARRELL:  Objection to form.

2       A.   I -- I -- I would provide my consent as a

3  patient friendly discussion of the -- of the

4  realistic expectations of the procedures and the

5  potential problems.  And that's how I'd describe it.

6       Q.   (BY MR. JOHNSON)  All right.

7              MR. JOHNSON:  Could we go off the

8  record real quick?

9              THE VIDEOGRAPHER:  Going off the

10  record.  Time is 2:39.

11              (A recess was taken from 2:39 p.m. to

12               2:40 p.m.)

13              THE VIDEOGRAPHER:  Back on the record.

14  Time is 2:40.

15              (Deposition Exhibit 8 referenced.)

16       Q.   (BY MR. JOHNSON)  Doctor, Exhibit

17  Number 8, is this just a history and phys- -- this

18  is your history and physical that you did on

19  August 24 that gets in -- gets filed into the

20  hospital record; is that right?

21       A.   Correct.

22       Q.   Okay.  Could you take a look at Exhibit

23  Number 9?  This is your Operative Report; is that

24  right?

Mark L. Lobaugh, M.D.

```
 1        A.    Yes.

 2        Q.    And what was your preoperative diagnosis?

 3        A.    "Stress urinary incontinence" is Number 1.

 4              Number 2, "Low Urethral Pressure

 5   Profile."

 6              Number 3, "Cystocele."

 7              Number 4, "Rectocele."

 8              And Number 5, "Vaginal Prolapse."

 9        Q.    And what was your postoperative diagnosis?

10   Was it the same?

11        A.    Yes.

12        Q.    What operation did you actually perform?

13        A.    Number 1, "Transvaginal tape placement."

14              Number 2, "Repair of rectocele."

15              Number 3, "Vaginal extracorporeal

16   colporrhaphy."

17              Number 4, "Anterior colporrhaphy."

18              Number 5, "Mesh, 2 units."

19              Number 6, "Cystoscopy."

20              Number 7, "Enterocele repair."

21              Number 8, "Perineoplasty."

22        Q.    Okay.  Can you just tell the jury briefly

23   how you use mesh to perform the anterior repair for

24   the cystocele and the posterior repair for the
```

Mark L. Lobaugh, M.D.

1    rectocele and enterocele?

2        A.   The -- you want me to describe the

3    procedure?

4        Q.   Yeah, just briefly.  Just kind of how

5    you -- how you do it.

6        A.   Okay.  So going back to my tube sock

7    model, I make an incision in the top portion of the

8    tube sock and I open up the tissue and basically

9    place the mesh underneath the hammock that I

10   described earlier and elevate the ball, and then

11   attach the mesh to the ligaments, the sides, and

12   then close up the tube sock.

13            The posterior repair, I make an

14   incision in the bottom portion of the tube sock, try

15   to find the -- dissect out the -- the tent and put

16   the mesh in over the tent and then attach the mesh

17   to the supporting tissue and then close up the tube

18   sock.

19       Q.   So you used two different pieces of mesh?

20       A.   Yes.

21       Q.   And then it says in the Operative Note

22   that you trimmed some of the -- the mesh after each

23   of those -- the anterior and the col- -- and the

24   posterior colporrhaphies.

Mark L. Lobaugh, M.D.

1              How did you learn how to -- how to do

2    that?

3        A.   The -- well, the mesh comes in one size,

4    and you trim the mesh to -- to fit the size of the

5    hammock or the size of the tent, and then that's

6    what you place into the -- to replace that -- those.

7        Q.   Did you inspect the mesh before you

8    implanted it?

9        A.   I mean, in what way?

10       Q.   Well, did you note any fraying of the

11   mesh?

12       A.   I -- I don't remember.  I mean, I can't --

13   I can't imagine not expect- -- inspecting it.  If

14   there was some obvious damage, then I -- I would

15   have noted it, but I don't recall.

16       Q.   Either would have noted it or asked for a

17   new kit?

18       A.   Yes.

19       Q.   Is there any evidence in the -- in the

20   records you have from that surgery that there was

21   any fraying of the mesh?

22       A.   No.

23       Q.   Any roping of the mesh?

24       A.   No.

Mark L. Lobaugh, M.D.

```
1          Q.   Any curling of the mesh?

2          A.   You mean prior to inserting it?

3          Q.   Yeah, prior to inserting it?

4          A.   No.

5          Q.   And any degradation of the mesh?

6          A.   No.

7          Q.   Did you try to put the mesh in tension-

8     free?

9          A.   Yes.

10         Q.   Why is that?

11         A.   That was the correct technique is to do a

12    tension-free placement, because keeping it tension-

13    free was supposed to reduce the risk of contracture

14    and was supposed to be a better, long-term repair.

15         Q.   Doctor, did you comply with the standard

16    of care in your treatment of Ms. Dalberg by use of

17    the Prolift® system for repair of her pelvic organ

18    prolapse in 2007?

19         A.   Yes.

20         Q.   Do you stand by your decision to use the

21    Gynecare Prolift® mesh to treat her pelvic organ

22    prolapse?

23         A.   Yes.

24         Q.   Okay.  Have you given the opinions that
```

Mark L. Lobaugh, M.D.

1   you've provided today and the testimony you've

2   provided today to a reasonable degree of medical

3   certainty?

4        A.   Yes.

5              MR. JOHNSON:   Thank you.

6              I'll reserve the rest of my time.

7   Let's go off the record.

8              THE VIDEOGRAPHER:  Going off the

9   record.   Time is 2:45.

10             (A recess was taken from 2:45 p.m. to

11              2:50 p.m.)

12             THE VIDEOGRAPHER:   Back on the record.

13   Time is 2:50.

14                    EXAMINATION

15   BY MR. FARRELL:

16       Q.   Doctor, I was introduced to you briefly

17   previously.   Sean Farrell here on behalf of

18   Mrs. Dalberg.

19             As counsel for defense has indicated,

20   there is no claim against you or any lawsuit pending

21   against you.

22             You understand that, correct?

23       A.   Yes.

24       Q.   Doctor, have you ever -- have you ever

Mark L. Lobaugh, M.D.

1    testified previous to today?

2         A.   Yes.

3         Q.   In what capacity?

4         A.   As a treating physician.

5         Q.   Okay.  Have you ever testified on behalf

6    of Ethicon in any matter prior -- or prior to today?

7         A.   No.

8         Q.   Okay.  Have you ever testified previously,

9    like today, where you have been the implanter of an

10   Ethicon product in another patient?

11        A.   Yes.

12        Q.   How many times did you testify in

13   instances such as that?

14        A.   Once.

15        Q.   And was that this year or was it previous

16   to this year?

17             MS. HARRIS:  Probably last year.

18        A.   Last year.

19             MS. HARRIS:  Probably.

20        Q.   (BY MR. FARRELL)  Last year.  Okay.

21             Doctor, what did you do to prepare for

22   your testimony here today?

23        A.   Read over the record that was provided for

24   me.

Mark L. Lobaugh, M.D.

1       Q.   And when did you have the opportunity to

2   actually review the record?

3       A.   Last night.

4       Q.   Okay.  So last night and prior to

5   today's -- today's deposition when you saw a few of

6   the exhibits, that was the only time you had the

7   opportunity to review records relating to your

8   testimony?

9       A.   Yes.

10      Q.   Okay.  And, Doctor, is it fair to say you

11  have no independent recollection of your

12  interactions with Mrs. Dalberg, correct?

13      A.   Correct.

14      Q.   And you're -- you're relying on the

15  records that you reviewed last night and earlier

16  today; is that correct?

17      A.   And also my experience of my normal

18  activities.

19      Q.   Okay.  Did you have any discussions with

20  anybody prior to your testimony here today regarding

21  your testimony?

22      A.   No.

23      Q.   Doctor, did you ever serve as a preceptor

24  for Ethicon?

Mark L. Lobaugh, M.D.

```
 1          A.    Not for a mesh.

 2          Q.    For what?

 3          A.    I may have served as a preceptor for

 4    thermoablation.

 5          Q.    All right.  Did you ever serve as a

 6    consultant for Ethicon?

 7          A.    No.

 8          Q.    And the thermoablation that you

 9    referenced, did -- referenced, what -- what type of

10    procedure is that?

11          A.    That's an endometrial ablation.

12          Q.    And, Doctor, I bel- -- correct me if I'm

13    wrong, but I believe you said you've been in

14    practice since 1982; is that correct?

15          A.    That's incorrect.

16          Q.    That's when you -- '82 is when you

17    graduated medical school?

18          A.    I graduated from medical school in 1986.

19          Q.    '86.  I'm sorry.

20                And how many years have you been in

21    practice as a obstetrician/gynecologist?

22          A.    I completed residency in 1996, so since

23    then.

24          Q.    And I believe you indicated that you're
```

Mark L. Lobaugh, M.D.

 1   board certified in obstetrics and gynecology,

 2   correct?

 3        A.   Yes.

 4        Q.   You have not obtained any additional

 5   certification for female pelvic medicine and

 6   reconstructive surgery; is that correct?

 7        A.   That's correct.

 8        Q.   Do you intend to pursue that additional

 9   certification?

10        A.   No.

11        Q.   I believe, and you can correct me if I'm

12   wrong, you indicated that your current practice

13   consists, in the majority, of obstetrics; is that

14   correct?

15        A.   That is correct.

16        Q.   And could you give me an estimate of the

17   percentage that obstetrics currently comprises your

18   practice?

19        A.   80 percent.

20        Q.   And what about in 2007, what percentage

21   was obstetrics -- obstetrics had comprised of your

22   total practice?

23        A.   60 percent.

24        Q.   60?

Mark L. Lobaugh, M.D.

1        A.    60.

2        Q.    And I believe you indicated the reason why

3    there was more -- a focus away from obstetrics back

4    in 2007 was that the urologist that was located in

5    your vicinity there in Texas did not handle female

6    patients; is that correct?

7        A.    That's correct.

8        Q.    And, Doctor, you went over some of the

9    procedures -- premesh procedures that you undertook

10   during medical school, residency, and so on; is that

11   correct?

12       A.    Correct.

13       Q.    Okay.  And I believe you indicated you

14   would do anterior and posterior colporrhaphies for

15   pelvic organ prolapse; is that correct?

16       A.    That's correct.

17       Q.    And what was the procedure that you

18   indicated that you would do for stress urinary

19   incontinence?

20       A.    Well, there were a number of procedures.

21   We -- for quite a while, I did the Burch procedure,

22   which is a urethropexy.

23            Before I started -- I used that

24   procedure predominantly before I started doing the

Mark L. Lobaugh, M.D.

1    TVT®s and TOTs.

2        Q.   Doctor, do you still have any occasion to

3    perform the surgeries without the use of mesh?

4        A.   Yes.

5        Q.   Okay.  What type of circumstances would

6    you move forward with performing a surgery to

7    address pelvic organ prolapse without the use of

8    mesh?

9        A.   If I have a patient that presents with the

10   symptoms of cystocele or rectocele and the

11   examination confirms a significant cystocele or

12   rectocele, I'll perform the anterior colporrhaphy

13   and/or posterior colporrhaphy, depending on the

14   clinical presentation.

15       Q.   So what percentage of your current

16   surgical practice would that type of procedure or

17   procedures represent?

18       A.   Less than 10 percent.

19       Q.   And what about the other 90 percent?

20   Would they all be comprised of mesh or would you use

21   other methods besides mesh?

22       A.   Can you repeat the question?

23       Q.   The other 90 percent of the surgeries you

24   would perform for pelvic organ prolapse, would they

Mark L. Lobaugh, M.D.

1   consist solely of mesh approach or would there be

2   other approaches that you also utilize?

3        A.   I'm not using any mesh for surgeries at

4   this point except for mid-urethral slings.

5        Q.   Doctor, are there any approaches, short of

6   surgery, that can be utilized to address pelvic

7   organ prolapse?

8        A.   Yes.

9        Q.   And what would they be?

10        A.   Physical therapy is one option.  We offer

11   that to our patients as an initial form of therapy.

12   We have a really good -- a very good female physical

13   therapy group here in our community, and so they can

14   work with the patients.

15             Another nonsurgical approach is

16   pessary, and that does not seem to be favored by,

17   really, any of the patients.

18        Q.   Doctor, you indicated that you received

19   training from Ethicon; is that correct?

20        A.   Yes.

21        Q.   Okay.  And from the defendants' fact sheet

22   that I was provided with, it looks like you attended

23   a training in March of 2007 at South Miami Hospital

24   relating to TVT-Secur and Prolift® preceptorship.

Mark L. Lobaugh, M.D.

1                    Do you recall that?

2        A.   Yes.

3        Q.   Okay.  Then that was followed by the

4   May 2007 training at the Metroplex Hospital in

5   Killeen, Texas.

6                    Do you recall that?

7        A.   Yes.

8        Q.   Okay.  I believe you testified that it was

9   your recollection it took place in 2006.

10                   Does the fact that it was held on

11  May 16th, 2007, refresh your recollection as to when

12  the training at the Metroplex Hospital took place?

13       A.   That -- that doesn't surprise me.  So,

14  again, I was trying to recollect over 10 years ago

15  of when these dates were is not -- not the easiest,

16  but it does make sense that I went to the didactic

17  course in -- in March, and then the preceptor

18  followed after that.

19       Q.   Do you recall the number of days of

20  training in South Miami lasted?

21       A.   Probably three or four days.  It was over

22  a long weekend.

23       Q.   And what about the -- the training that

24  took place at the Metroplex Hospital?

Mark L. Lobaugh, M.D.

1      A.   That was a one-day training session.  I

2   had three cases that I had scheduled, and the

3   physician from Corpus Christi assisted me and

4   instructed me on those three cases.

5      Q.   So the training that took place in Miami,

6   did that involve didactic and cadaver labs?

7      A.   To my -- the courses always had a didactic

8   portion with a training lab.  I don't specifically

9   remember how that course was set up, but I'll have

10   to just say that the way these courses were set up,

11   that was typical how they -- how they were done.

12      Q.   And what did the training at the

13   Metroplex -- Metroplex Hospital entail, to your

14   recollection?

15      A.   Again, that was -- I had three cases at

16   the hospital, and the training surgeon who was there

17   was assisting me on the cases and in- -- and

18   instructing me and proctoring me through the cases.

19      Q.   And those three cases, do you recall what

20   products you used?  Would that be the Prolift® in

21   each of them or were you also using the TVT-Secur?

22      A.    Well, yeah, it was all three of them.

23           Because if Gynecare is sending a

24   proctor, I'm gonna be using Gynecare's product.

Mark L. Lobaugh, M.D.

1      Q.   How did you learn about the course being

2   offered in Miami?

3      A.   I don't recall.

4      Q.   Okay.  Were you approached by a

5   representative from Ethicon in order to attend that

6   training?

7      A.   It probably was made available through a

8   representative, because at that time I had a very

9   active practice and a very active interest in pelvic

10  prolapse.  So I was getting a lot of invitations

11  through a lot of different courses, and I attended a

12  lot of CMEs on different courses.

13           So it was probably -- I just kind of

14  at that time was sort of in that circle where I was

15  getting that information provided to me routinely.

16     Q.   Okay.  And the same question with regards

17  to the training at the Metroplex Hospital, was that

18  communicated to you by a representative from

19  Ethicon?

20     A.   Most likely.  It was probably set up

21  through -- through the representative.

22     Q.   Did Ethicon pay for the cost of your

23  attendance at the training program in South Miami?

24     A.   Most likely they did or at least the

Mark L. Lobaugh, M.D.

1    majority of it.

2         Q.   I'm sorry, Doctor, you broke up.

3         A.   At least the majority of it.

4         Q.   Did Ethicon pay for your travel to and

5    from the training in South Miami?

6         A.   Most likely they did.  I don't know for

7    sure, but most likely they did.

8         Q.   Were you reimbursed for any meals that

9    were related to your travel to and from the training

10   in South Miami?

11        A.   I don't recall, but I know that the

12   meal -- a lot of the meals were provided.

13        Q.   Did you know the instructor or instructors

14   at the South Miami Hospital training prior to you

15   attending that course?

16        A.   I believe the -- one of the main

17   instructors was Bill Sayee, and I had -- I did know

18   Bill Sayee.  I had been at quite a few conferences

19   previously where he was a presenter.

20             MR. JOHNSON:  How do you -- how do you

21   spell his name?

22             THE WITNESS:  S-a-y-e-e.  S-a-y-e-e is

23   his last name.

24             MR. JOHNSON:  Thank you.

Mark L. Lobaugh, M.D.

1      Q.   (BY MR. FARRELL)  And what about the

2  instructor or the proctor for the Metroplex Hospital

3  trainings?  You indicated that he was a physician

4  from Corpus Christi.

5           You don't recall his identity,

6  correct?

7      A.   I do not.  And I did not know him before

8  he came to proctor me.

9      Q.   Correct me if I'm wrong.  I believe you

10  indicated that you did have some training in pelvic

11  organ -- organ prolapse mesh through Bard prior to

12  the training with Ethicon; is that correct?

13      A.   I believe so, yes.

14      Q.   But you stated that you only did one or

15  two implantations of the Bard; is that correct?

16      A.   I'm not sure if I used any of the Bard

17  product on any of my own patients.

18      Q.   Okay.  And you used the Bard during your

19  residency for the 1-1/2 years in California prior to

20  fulfilling your commitment with the military?

21      A.   That is incorrect.  There was no mesh used

22  in my residency in California.

23      Q.   Okay.  So the training for the mesh with

24  Bard, to the best of your recollection, you don't

Mark L. Lobaugh, M.D.

 1  believe that you ever used that to implant into any

 2  of your patients for pelvic organ prolapse surgery;

 3  is that correct?

 4      A.   I'm not sure if I used it after the

 5  course.  I think somewhere in the time frame between

 6  2006/2007 and when I quit using the mesh in

 7  2010/2012, it's somewhere during that course I

 8  believe I did use the Bard product.

 9      Q.   Prior to the training in March of 2007,

10  had you ever implanted Prolift® in any of your

11  patients?

12      A.   No.

13      Q.   Had you ever observed a Prolift®

14  implantation prior to your training in South Miami

15  in March of 2017?

16      A.   I don't believe so.

17           MR. JOHNSON:  You said 7- -- Counsel,

18  you said March of 2017.  I think you misspoke.

19           MR. FARRELL:  I did.  Thank you.

20  2007.  Thank you.

21      Q.   (BY MR. FARRELL)  Doctor, is it fair to

22  say that when you went for the training in South

23  Miami in March of 2007, that was the first time that

24  you got an in-depth information regarding the

Mark L. Lobaugh, M.D.

1    Prolift® product?

2        A.   I would say that's not correct.  I mean, I

3    certainly had been exposed to the literature and

4    looked at videos and had gone to courses before

5    where they had talked about it.  So I had a pretty

6    good idea of what it was about before I went down to

7    the course in South Florida.

8        Q.   But that course -- but that course would

9    have been your first hands-on experience with the

10   product; is that correct?

11       A.   Yes, I believe so.

12                (Phone interruption.)

13       Q.   (BY MR. FARRELL)  And that would be

14   inclusive of the didactic training you indicated?

15                I believe you said you might have seen

16   a video; is that correct?

17                MR. JOHNSON:  Object to the form.

18       A.   Yes.

19       Q.   (BY MR. FARRELL)  Okay.  And you also

20   participated in the cadaver labs; is that correct?

21       A.   Yes.

22       Q.   You were asked previously about material

23   that you would have been provided with at the

24   training.

Mark L. Lobaugh, M.D.

1            Do you recall whether or not you were

2    provided with any materials, written materials?

3        A.   Oh, I'm sure I was provided with

4    materials, but I don't recall which ones.

5        Q.   Okay.  To the best of your recollection,

6    do you still have any of the materials from that

7    training?

8        A.   I do not.

9        Q.   Do you recall whether or not you reviewed

10   the Instructions For Use relating to the Prolift® as

11   part of the training in South Miami?

12       A.   It was probably part of the didactic

13   training.  So I think that that was a presentation

14   within the didactic training.

15       Q.   And you indicated that you -- there was a

16   presentation made by some of the professors there,

17   correct?

18       A.   As far as I can remember.  I mean, I kind

19   of --

20       Q.   Do you recall anything -- sorry.

21       A.   I don't -- I don't really recall the

22   details of the course, but just when I'm speaking of

23   these courses, I'm speaking on generally how they

24   were run.

Mark L. Lobaugh, M.D.

1                      They were all pretty much the same,

2    and it started off with the didactic session which

3    would go over the product, discuss the procedure,

4    discuss the steps that were needed in order to use

5    the product, and then the follow-up would be a

6    cadaver lab to reinforce the didactic portion of

7    the -- of the course.

8         Q.   Was the information presented to you at

9    the South Miami training important to you so that

10   you could use that information as part of your -- of

11   your decision regarding whether or not you wanted to

12   use the Prolift® with any of your patients?

13        A.   I pretty much already knew I wanted to use

14   the Prolift®, so it re- -- reinforced my instruction

15   on the product, and so it was very beneficial to

16   reinforce those areas that I -- I already knew and

17   to add additional information to the areas I didn't

18   know.

19        Q.   And, Doctor, did you presume that the

20   information that was being provided to you by the

21   training in South Miami would be accurate, to the

22   best of Ethicon's knowledge, for you --

23        A.   Yes.

24        Q.   -- to use their product?

Mark L. Lobaugh, M.D.

1       A.    Yes.   I counted on that.

2       Q.    Doctor, did you believe that the

3   information that was being presented to you at the

4   Ethicon training in South Miami would be fair and

5   balanced in the sense that it would tell you both

6   the positive aspects of implanting your patients

7   with Prolift® and also tell you about the risks or

8   actual problems that they were aware of so that you

9   could balance those in your mind?

10              MR. JOHNSON:   Object --

11      A.    Yes.

12              MR. JOHNSON:   I'll object to the form.

13      Q.    (BY MR. FARRELL)   Doctor, did you presume

14  that any risks that Ethicon knew about, especially

15  any serious risks they knew about relating to the

16  Prolift®, would be presented to you as part of the

17  presentation you received in South Miami so that you

18  would have a full understanding what the risks were?

19      A.    I counted on that information being

20  presented.

21      Q.    Doctor, is it fair to say that prior to

22  your Prolift® training in South Miami, you had not

23  surgically implanted any large volume of

24  polypropylene mesh in a woman's pelvis like that of

1   the Prolift®?

2       A.   Yes, that is -- that is an accurate

3   statement.

4       Q.   Doctor, during the presentation that was

5   pre- -- given to you in South Miami relating to the

6   Prolift® product, do you recall whether or not you

7   were actually provided with information about

8   clinical studies that had been done with the

9   Prolift® and the prototypes for the Prolift® so that

10  you'd have some data relating to any such studies?

11              MR. JOHNSON:  Object to the form.

12      A.   I don't recall if that was part of the

13  course or not.

14      Q.   (BY MR. FARRELL)  Doctor, did you presume

15  that any data that was presented to you during the

16  training in South Miami would be accurate and that

17  Ethicon would be presenting to you actual data from

18  any studies that were conducted?

19              MR. JOHNSON:  Object to the form.

20      A.   I -- I -- as a general OB/GYN, I am not an

21  academician, so I don't really read all of the

22  literature.  I trust the academicians to evaluate

23  the literature and present that.

24              And so I trust those people who are

Mark L. Lobaugh, M.D.

1   responsible for those to provide us with -- with

2   informa- -- provide me with information and products

3   that are trusted and available to be used.  And

4   that's -- that was my -- my belief with the Prolift®

5   and Ethicon.

6        Q.   (BY MR. FARRELL)  Doctor, as part of your

7   training in South Miami, were you shown any Prolift®

8   implantation video?

9        A.   I don't recall, but I think that -- I

10  would -- I would believe that I was, again, just

11  because that's the nature of how these courses were

12  set up.

13       Q.   As part of your training from Ethicon,

14  were you ever told that -- to lay the mesh flat in

15  the pelvic space during implantation?

16       A.   I don't recall them using those specific

17  words.

18       Q.   Doctor, as part of your training from

19  Ethicon, were you ever told that the mesh arms of

20  the Prolift® could rope or curl due to tension of

21  the arms when they were being pulled through the

22  trocars?

23            MR. JOHNSON:  Object to the form.

24       A.   I don't recall it ever being specifically

Mark L. Lobaugh, M.D.

1    mentioned.

2         Q.   (BY MR. FARRELL)  Doctor, during your

3    training, did Ethicon ever inform you that there was

4    an increased risk to patients from curling and

5    roping of the Prolift® arms in the obturator space

6    and the gluteal muscle tissue area?

7              MR. JOHNSON:  Object to the form.

8         A.   No.

9         Q.   (BY MR. FARRELL)  Doctor, during your

10   training, did Ethicon ever inform you that as a

11   result of any curling and/or roping of the Prolift®

12   arms, that there could be an increased risk of

13   scarring, contraction, erosion, and chronic pelvic

14   pain for the recipient?

15             MR. JOHNSON:  Object to the form.

16        A.   No.

17        Q.   (BY MR. FARRELL)  Doctor, during the

18   presentation from Ethicon, were you ever informed

19   that they were aware that there were some patients

20   who as a result of being implanted with the Prolift®

21   would be left with lifelong pain and inability to

22   have normal sexual relations as a result of the

23   implantation?

24             MR. JOHNSON:  Object to the form.

Mark L. Lobaugh, M.D.

 1      A.   Well, that was part of the general risk of

 2   doing an anterior and posterior repair.

 3      Q.   (BY MR. FARRELL)  A general risk was the

 4   possibility of having lifelong pain and inability to

 5   have normal sexual relations for the remainder of

 6   their life?

 7      A.   Yes.  Even if you don't use mesh, that's a

 8   potential risk.

 9      Q.   Were you provided with any information

10   from Ethicon regarding any data they had regarding

11   the occurrence of any such risk?

12            MR. JOHNSON:  Object to the form.

13      A.   I don't recall.

14      Q.   (BY MR. FARRELL)  Doctor, during your

15   training from Ethicon, were you ever informed that

16   they were aware that there were some patients that

17   would have contraction of the mesh and that the pain

18   and the erosion and the complications resulting from

19   any such contraction would not be able to be

20   successfully treated and that those patients would

21   be left with lifelong pain?

22            MR. JOHNSON:  Object to the form.

23      A.   Again, that goes along with the general

24   risk for any type of anterior and posterior repair,

Mark L. Lobaugh, M.D.

1    whether there's mesh or not.  There's always that --

2    that chance of scarring, contracture, and pain and

3    dyspareunia.

4         Q.   (BY MR. FARRELL)  But the possibility of

5    contraction of the mesh is only a possibility when

6    mesh is implanted, correct?

7              MR. JOHNSON:  Object to the form.

8         A.   Well, yes, if the mesh contracts.  But the

9    tissue -- the normal native tissue can also contract

10   and scar.

11        Q.   (BY MR. FARRELL)  Were you told by Ethicon

12   at the training you attended that scarring and

13   contraction of the mesh was actually a positive

14   aspect of the Prolift®?

15             MR. JOHNSON:  Object to the form.

16        A.   Scarring of the mesh was considered a

17   benefit because that's how it reinforced the tissue

18   and was what was responsible for the repair or the

19   reduction of the cystocele and the rectocele.

20        Q.   (BY MR. FARRELL)  Did Ethicon inform you

21   at your training that the contraction of the mesh

22   could cause serious injury and that they were aware

23   that, in fact, it would cause serious harm in some

24   Prolift® patients?

Mark L. Lobaugh, M.D.

1          MR. JOHNSON:  Object to the form.

2     A.   That was thought to be a very rare

3  complication.

4     Q.   (BY MR. FARRELL)  And when did you come

5  upon that understanding that that would be -- or

6  that was thought to be a rare complication?

7     A.   What?

8     Q.   At what point in time?

9     A.   That what was a rare complication?

10    Q.   Your answer was that you believed -- or

11  that was thought to be a rare complication.

12    A.   What was thought to be a rare

13  complication?

14    Q.   The contraction of the mesh that could

15  cause serious injury and would cause serious harm in

16  some of Prolift® patients.

17    A.   So when did they provide that information?

18    Q.   When -- when did you become aware of that

19  information?  Yes.

20    A.   Well, I think right from the very start.

21    Q.   You -- you believe or you're sure?

22    A.   No, I -- I'm not sure.  You know, again,

23  this was over 10 years ago.

24          But, again, these -- this was one of

Mark L. Lobaugh, M.D.

1    the potential complications of the mesh surgery,

2    although it was thought to be a very unusual, rare,

3    infrequent complication.

4        Q.   During your training, did Ethicon make you

5    aware that if for some reason the Prolift® patients

6    would have complications that required removal of

7    the mesh, that it would be impossible for some

8    patients to have the mesh removed in a safe and

9    effective way and that their complications would

10   therefore be on a permanent basis?

11       A.   No, I never was aware of that fact.

12            MR. JOHNSON:  And I'll object to the

13   form.

14       Q.   (BY MR. FARRELL)  Is that information

15   something that you would have wanted to be aware of

16   in determining whether or not to use the Prolift®

17   with one of your patients?

18            MR. JOHNSON:  Ob- --

19       A.   Yes.

20            MR. JOHNSON:  Object to the form.

21       Q.   (BY MR. FARRELL)  Doctor, the -- the three

22   cases you had on May 15th, 2007, where the physician

23   from Corpus Christi was there to assist you, were

24   they the first implantations of the Prolift® that

Mark L. Lobaugh, M.D.

1   you undertook after the training in March of 2007?

2       A.   Yes.

3       Q.   Do you recall when after May 15th, 2007,

4   that you first performed your own -- your first

5   implantation of a Prolift® product by yourself

6   without any assistance?

7            MR. JOHNSON:   Object to the form.

8       A.   I -- I don't know exactly, but I'm sure it

9   was within the next couple weeks after that.

10      Q.   (BY MR. FARRELL)   Doctor, do you have a

11  recollection of how many Prolift® implantations you

12  performed prior to your implantation of Mrs. Dalberg

13  on August 29th, 2007?

14      A.   My estimate would be maybe -- maybe 10.

15      Q.   And, Doctor, I believe you've already

16  indicated, but there did come a time when you

17  stopped implanting Prolift® into your patients; is

18  that correct?

19      A.   Yes.

20      Q.   And what year was that?

21      A.   I'm not sure of the specific year, but I

22  imagine it was around 2010.

23      Q.   And why did you stop using Prolift® in your

24  patients at that point in time?

Mark L. Lobaugh, M.D.

 1          A.   Well, actually, I probably stopped using

 2     Prolift® before that.  I stopped using mesh

 3     completely in 2010 -- about 2010.

 4                    I stopped using Prolift® somewhere

 5     between probably 2008/2009.  I'm not sure of the

 6     exact last time.

 7          Q.   And why did you stop using Prolift® at that

 8     point in time?

 9          A.   I started using a different product.  As

10     the different mesh products came out, I think they

11     each had different advantages, and I ended up using

12     or liking Boston Scientific's mesh at the end.

13                    So all my cases at the end were -- I

14     believe were Boston Scientific.

15          Q.   Doctor, are you aware that Prolift® was

16     pulled off the market in 2012?

17                    MR. JOHNSON:  Object to the form.

18          A.   I knew that it was pulled off.  I wasn't

19     sure of the exact date.

20          Q.   (BY MR. FARRELL)  Are you aware why

21     Prolift® was pulled off the market in 2012, Doctor?

22                    MR. JOHNSON:  Object to the form.

23          A.   Because of the complications that have --

24     have arisen as for all mesh, I believe.  I think

Mark L. Lobaugh, M.D.

1    there's only one that's still available.

2        Q.   (BY MR. FARRELL)  And when you say "one,"

3    are you specifically referring to Ethicon product?

4        A.   No.  No, the only one that I know that's

5    available, I believe, is still Boston Scientific.

6        Q.   And, Doctor, are you fa- -- are you

7    familiar with the FDA advisory committee hearing in

8    September of 2011?

9        A.   Yes.

10       Q.   And do you understand that the FDA

11   determined that the risk of pelvic organ prolapse

12   surgeries outweighed the benefits and that it was

13   only to be used as a matter of last resort?

14               MR. JOHNSON:  Object --

15       A.   Yes.

16               MR. JOHNSON:  I'll object to the form.

17       Q.   (BY MR. FARRELL)  And, Doctor, are you

18   aware that when the FDA determined that Ethicon

19   would have to conduct the 522 studies, which would

20   consist of randomized control trials to prove the

21   safety and efficacy of the Prolift®, that they chose

22   not to undertake those studies and instead take the

23   product off the market?

24               MR. JOHNSON:  Object --

Mark L. Lobaugh, M.D.

1        A.    No --

2              MR. JOHNSON:  I'll object to the form.

3        A.    No, I was not aware of that.

4        Q.    (BY MR. FARRELL)  Doctor, would it have

5   been important to you in deciding whether or not to

6   ever implant one of your patients with the Prolift®

7   product that Ethicon had no randomized control

8   trials proving the safety or efficacy of that

9   device?

10             MR. JOHNSON:  Object to the form.

11       A.    That -- that -- I -- as -- again, as a

12  general obstetrician/gynecologist, my -- my role is

13  to rely on the experts, including Ethicon -- the

14  people at Ethicon, to provide me with information on

15  products that are safe and beneficial and are

16  considered of good use for my patients.

17             As far as whether or not it's a random

18  controlled trial study or a case cohort study or a

19  case control study, what other -- what other -- what

20  type of study they -- they need to do to provide

21  that assurance that they are giving me a good

22  product, a safe product, is up to them.

23             I'm not gonna be able to analyze a

24  randomized controlled study and tell you whether or

Mark L. Lobaugh, M.D.

 1    not this is the answer.

 2               I -- I rely on those academicians that

 3    are discussing those things, and I'm relying on the

 4    companies like Ethicon to obtain that information

 5    and provide that information so that we're getting a

 6    safe product that we can use for our patients.

 7        Q.   (BY MR. FARRELL)   Doctor, were you aware

 8    that the Prolift® was sold from March 2005 until

 9    May 2008 without any FDA clearance?

10        A.   No.

11               MR. JOHNSON:   Object to the form.

12        Q.   (BY MR. FARRELL)   And during that time

13    period when there was no FDA 510(k) clearance, that

14    included the August 29th, 2007, surgery for

15    Mrs. Dalberg; is that correct?

16               MR. JOHNSON:   Object to the form.

17        A.   Yes.

18        Q.   (BY MR. FARRELL)   If you were aware that

19    the Prolift® had not received FDA clearance as of

20    the date that you performed the surgery upon -- upon

21    Mrs. Dalberg, would you still have recommended that

22    the Prolift® be used for her?

23        A.   I did not say -- I did not say that I was

24    aware there was no FDA approval.

Mark L. Lobaugh, M.D.

1            I said that -- yes to that as the time

2   frame the surgery was.  I was not aware that there

3   was not an FDA approval.

4       Q.   So if you had been aware that there was no

5   FDA clearance for the Prolift® at the time that you

6   implanted it in Mrs. Dalberg, would you have moved

7   forward with recommending that that product be

8   utilized for her?

9            MR. JOHNSON:  Object to the form.

10      A.   Yes, because there's a lot of things that

11  are not FDA approved that we use.

12           And, again, I rely on the company --

13  the Ethicon company and their science people and

14  their physicians and their -- their professors who

15  are making this product available.

16           I, as a generalist, am relying on

17  these acade- -- academicians that they are providing

18  me with a safe, reliable, and beneficial product.

19      Q.   (BY MR. FARRELL)  Doctor, by the time that

20  you stopped using Prolift® as part of your practice,

21  approximately how many of the Prolift® products had

22  you implanted?

23      A.   I don't have any way to know that, but I

24  can say it probably was at least 20 or 30.

Mark L. Lobaugh, M.D.

```
 1        Q.   Doctor, as you continued to utilize the

 2   Prolift® as part of your practice, did you gain any

 3   additional knowledge of the risks or complications

 4   that came with the use of that product?

 5        A.   Yes.

 6        Q.   What specifically did you obtain new

 7   knowledge of?

 8        A.   Well, I noticed through my experience that

 9   my erosion rate was higher than what they had

10   published.

11        Q.   Anything else?

12        A.   That's the main thing.  I can't think of

13   anything else specific to the Prolift®.

14        Q.   And was that part -- was that part of the

15   reason why you discontinued the use of the Prolift®

16   product?

17             MR. JOHNSON:  Object to the form.

18        A.   No.

19        Q.   (BY MR. FARRELL)  And, Doctor, if you were

20   aware -- aware of the erosion rate that you found to

21   be higher in practice, if you had known about that

22   higher rate than what the published rate was at the

23   time that you counseled Mrs. Dalberg for her

24   surgery, would you have still recommended the
```

Mark L. Lobaugh, M.D.

1   Prolift® product to her?

2               MR. JOHNSON:  Object to the form.

3       A.   Well, first of all, the erosion -- the

4   higher erosion rate wasn't just for the Prolift®.

5   It was for all mesh, all the different ones that

6   I've used.  I noticed that my erosion rate seemed to

7   be higher than what they were publishing.

8               And as far as Ms. Dalberg, she was not

9   in that time frame when I noticed the higher erosion

10  rate.  She was one of the early procedures that I

11  did, and my erosion rate at that point was still in

12  line with what was published.

13      Q.   (BY MR. FARRELL)  But the question was if

14  you -- with the knowledge of the higher erosion

15  rate, if you were aware of that at the time that you

16  counseled her regarding use of the Prolift®, would

17  you have still recommended that product to her?

18              MR. JOHNSON:  Object to the form.

19      A.   I would have told her that I'm seeing a

20  little bit higher erosion rates than what they're

21  saying, and I would have counseled her on that and

22  given her the choice to use it.

23              The -- but a lot of the erosions were

24  very minor, and it just involved trimming the mesh

Mark L. Lobaugh, M.D.

1  and suturing the epithelium closed.  I do that in my

2  office, and a lot of times that took care of the

3  problem.

4      Q.   (BY MR. FARRELL)  Doctor, I believe you

5  indicated that you used -- discontinued use of any

6  mesh to address pelvic organ prolapse in 2010; is

7  that correct?

8      A.   That's an estimate.  About 2010.

9      Q.   Okay.  Why did you make the decision to

10 stop using mesh to address pelvic organ prolapse in

11 approximately 2010?

12     A.   The -- I believe the main reason was is

13 because the -- the patients that were being referred

14 to me were no longer being referred to me.  They

15 were being referred to the urologist.

16          The original referral source of

17 patients that I had was from a urologist who did not

18 do female urology, so he sent all the patients to

19 me.

20          He retired and moved on.  A new

21 urologist came in, and so all those referrals were

22 kept within the urology department because the new

23 urologist did pelvic surgery.

24          Essentially, that pretty much ended my

Mark L. Lobaugh, M.D.

1    referral source for these patients.

2        Q.    Doctor, did you have any interactions with

3    any sales representatives from Ethicon prior to your

4    beginning to use the Prolift® product?

5        A.    Yes.

6        Q.    Do you recall the individual's name?

7        A.    I don't remember her name, no.

8        Q.    Okay.  It was female, though?

9        A.    Yes.  I think her first name was Katie.

10        Q.    Well, when in time do you recall having

11   your first interaction with her?

12        A.    I don't recall the first interaction, but

13   I believe we were doing the Thermachoice endometrial

14   ablations with Ethicon long before we were doing the

15   Prolift®, I believe.  I could be mistaken on that.

16        Q.    Okay.  Well, based upon your belief, then,

17   that -- your first interaction would have been prior

18   to the training in South Miami in March of 2007,

19   correct?

20        A.    I believe so.

21        Q.    Were any other Ethicon products marketed

22   to you in addition to the Prolift®?

23        A.    The Thermachoice and the TVT®.

24        Q.    After you became trained relative to the

Mark L. Lobaugh, M.D.

1  Prolift®, did the sales representative begin to

2  contact you regarding your use of that product in

3  your patients?

4       A.   Yes.

5       Q.   And what specifically would the

6  interaction consist of?

7       A.   Oftentimes, the rep would come into the

8  operating room with us and just kind of oversee the

9  product and be there if we had any questions about

10  the product.

11      Q.   So the sales rep would be present at times

12  in the operating room while you were implanting

13  these Prolift® products?

14      A.   I believe so, yes.

15      Q.   And I believe you indi- -- you just

16  indicated that the purpose of the representative

17  being present was to provide advice, if necessary?

18            MR. JOHNSON:  Object to the form.

19      A.   Not advice, but just to help with the

20  setup of the instruments and help with the -- I

21  think oftentimes, the reps -- not just with Ethicon,

22  but with other ones, would pull off the lot numbers

23  and put them on the -- the chart.

24      Q.   (BY MR. FARRELL)  Did Katie play any role

Mark L. Lobaugh, M.D.

1    in having you participate in the training in South

2    Miami in March of 2007?

3         A.   Well, if it wasn't Katie, it was one of

4    the reps arranged for the -- me to get enrolled in

5    the course.

6         Q.   That was a male rep?

7              MR. JOHNSON:   Object to the form.

8         A.   That was what?

9         Q.   (BY MR. FARRELL)   That was a male

10   representative?

11        A.   No.  I think it was Katie or someone.  I

12   don't remember.

13        Q.   Okay.

14        A.   I don't remember who exactly introduced me

15   to the course.

16        Q.   Did Katie or any other representative

17   attend a training with you in South Miami?

18        A.   I do not believe so.

19        Q.   Do you still have any dealings today with

20   any Ethicon sales representatives?

21        A.   No.

22        Q.   Do you still perform the ablation

23   procedures?

24        A.   Not that one.

Mark L. Lobaugh, M.D.

1       Q.   You perform a different one at this point

2   in time?

3       A.   Correct.

4       Q.   And does that utilize a product from a

5   different company?

6       A.   Yes.

7       Q.   And what was the reason you changed from

8   Ethicon to the new company for the ablation product?

9       A.   I liked the procedure better.

10      Q.   And what company is that?

11      A.   I'm not really sure.  It's the hydro

12   ablation.  It may be AMS.  I'm not sure.

13      Q.   Did Katie or any other Ethicon

14   representative ever provide you with Ethicon

15   materials relating to the Prolift® product?

16      A.   Yes.

17      Q.   What type of materials?

18      A.   Literature, brochures, training videos.

19      Q.   What type of brochures were they?

20      A.   Patient brochures.  Patient information

21   brochures.

22      Q.   Do you have any recollection of Katie or

23   another representative and yourself going through

24   the patient brochures in order -- with you in order

Mark L. Lobaugh, M.D.

1    to explain what information was contained in those

2    brochures?

3        A.    No.

4        Q.    No, you don't recall, or, no, it did not

5    happen?

6        A.    I don't believe it happened.  I mean, I

7    could go through the brochures myself and read them

8    and then provide them to the patients.

9        Q.    Did Katie or any other Ethicon sales

10   representative ever go through any physicians'

11   marketing materials with you?

12       A.    I imagine they did.  That was part of why

13   I got the brochures.

14       Q.    Did Katie or any other Ethicon sales

15   representative ever go through the Prolift®, IFU or

16   Instruction For Use booklet with you?

17       A.    No.

18       Q.    Do you recall ever speaking with Katie or

19   any other Ethicon sales representative regarding any

20   warnings that Ethicon had issued relative to the

21   Prolift® product?

22       A.    I don't recall.

23       Q.    And did Katie or any other Ethicon

24   representative ever compare any of the Prolift®

Mark L. Lobaugh, M.D.

1    products to any other manufacturers' pelvic floor

2    repair products with you?

3         A.   I don't recall.

4         Q.   Do you recall ever having any questions or

5    concerns with any of the mesh products from Ethicon,

6    including the Prolift®, that were addressed by Katie

7    or any other Ethicon sales representatives?

8         A.   I don't recall.

9         Q.   Do you currently use any Ethicon product

10   as part of your practice?

11        A.   Suture.

12        Q.   What about the mesh slings that you

13   referenced earlier, what company do you use, mid- --

14        A.   I'm not su- --

15        Q.   -- mid-urethral slings, I believe you

16   said?

17        A.   I'm not sure which sling the hospital has.

18             The number of slings I do per year is

19   less than six, and the one who does most of the

20   slings are the urologists, and so when I do a sling,

21   I have the urologist assist me because I do so few

22   of them.

23        Q.   Earlier during your testimony you in- --

24   you indicated that you decided to use the Prolift®

Mark L. Lobaugh, M.D.

1    because it was most available to you and it was the

2    one that you had the most training in.

3                   Do you recall that testimony?

4         A.   Yes.

5         Q.   How was the Prolift® product most available

6    to you?

7         A.   Well, at that time, I think that Bard and

8    Prolift® were the only two that were out -- out

9    there, and so I'm not sure that the other companies

10   really had established their -- their product line.

11   I know that it was fairly soon after that the

12   others -- others had theirs.

13                  So it was just the one that was -- I

14   had the most information about.  They were the one

15   that sent me to the course.  They were the one that

16   provided me with the proctor.

17                  So I -- I had a lot of good

18   information and good training on -- on their system.

19   So I felt most comfortable using something that I

20   had seen and actually had had a chance to actually

21   apply it in a cadaver or lab situation.

22                  And then had a proctoring physician, a

23   experienced surgeon, be able to assist me on my

24   first three cases to kind of just sort of complete

Mark L. Lobaugh, M.D.

1    the training that I needed in order to have the

2    product.

3              So Ethicon provided all that training,

4    and it was with their Prolift®.

5    Q.   Doctor, when you stopped using the Prolift®

6    product, did Katie or any other Ethicon

7    representative express any concern to you about your

8    stopping the use of that product?

9    A.   I don't believe so.  Actually, I don't

10   remember any.

11   Q.   Doctor, do you agree that in order to

12   determine whether a medical device is safe and

13   effective, the device must be adequately studied?

14             MR. JOHNSON:  Object to the form.

15   A.   Yes.

16   Q.   (BY MR. FARRELL)  Doctor, do you agree

17   that the best way to determine whether a medical

18   device is safe and effective is for a manufacturer

19   to conduct randomized controlled trials of the

20   device?

21             MR. JOHNSON:  Object to the form.

22   A.   I'm not sure if that's the best way.  I

23   mean, those are certainly good studies, but it

24   doesn't necessarily mean that that's the best.

Mark L. Lobaugh, M.D.

1          And, again, I am not an academic

2   physician.  I'm a -- I'm a worker bee out there in

3   the field taking care of these patients, and so I

4   rely on those academic people that are doing these

5   studies to determine which type of study is gonna be

6   the most appropriate and the best.

7       Q.   (BY MR. FARRELL)  Doctor, did you believe

8   at the time that you recommended the Prolift®

9   product to Mrs. Dalberg that Ethicon had ade- --

10  adequately studied the Prolift® product in order to

11  determine that it was both safe and effective?

12      A.   Yes.

13      Q.   Doctor, do you rely upon the manufacturer

14  of a product, at least in part, to provide you with

15  adequate warnings regarding the serious health

16  hazards associated with its product so that you can

17  adequately inform patients of any serious hazards?

18          MR. JOHNSON:  Object to the form.

19      A.   That's essential.  I mean, that's the only

20  way I can practice medicine is to have that

21  information to relay to the patients.

22      Q.   (BY MR. FARRELL)  I'm sorry, Doctor.  Did

23  you say "that's essential"?

24      A.   It's essential.  Yes.

Mark L. Lobaugh, M.D.

1       Q.   You're blipping out a little bit.

2            You said "essential," correct?

3            MS. HARRIS:  Correct.

4       A.   Yes.

5       Q.   (BY MR. FARRELL)  Okay.  Doctor, at the

6    time of the Prolift® implant with Mrs. Dalberg, did

7    you rely on Ethicon's Instructions For Use, at least

8    in part, to help inform her about the hazards

9    associated with the device?

10           MR. JOHNSON:  Object to the form.

11      A.   Can you repeat the question?

12      Q.   (BY MR. FARRELL)  Yes.

13           At the time of the surgery with

14   Mrs. Dalberg, did you rely, at least in part, on the

15   Instructions For Use from Ethicon in order to be

16   able to inform Mrs. Dalberg about the possible

17   serious hazards that could be associated with the

18   device?

19           MR. JOHNSON:  Object to the form.

20      A.   I wouldn't say I used the instructions.

21   The instructions, to me, what you're asking -- I

22   mean, the instructions basically tell you how to

23   use -- how to insert the product.

24      Q.   (BY MR. FARRELL)  Right.

Mark L. Lobaugh, M.D.

1                    And then also the Instructions For

2    Use, which we'll get to in a little bit, also sets

3    out warnings and precaution, adverse reactions, that

4    type of information?

5         A.   I did not use the instruction sheet for

6    that.  I used my -- my consent -- informed consent

7    to discuss the -- the adverse potential risks.

8         Q.   Doctor, what sources of information did

9    you use prior to counseling Mrs. Dalberg about the

10   risks and benefits of the Prolift® implantation

11   surgery?

12        A.   Can you repeat the question?

13        Q.   Yeah.

14                  (Phone interruption.)

15        Q.   (BY MR. FARRELL)  What -- what sources

16   of -- sources of information did you use prior to

17   counseling Mrs. Dalberg about the risks and benefits

18   of the Prolift® implantation surgery?

19        A.   All my training from residency and all my

20   experience in practice regarding anterior and

21   posterior repairs and all of my education I received

22   from the training from Ethicon, all of that goes

23   into providing an informed consent.

24        Q.   Doctor, you were -- you were familiar with

Mark L. Lobaugh, M.D.

1    the Instructions For Use prior to moving forward

2    with the surgery upon Mrs. Dalberg, correct?

3         A.   Now, the "Instructions For Use," what do

4    you mean for that?  Are you talking about that

5    pamphlet?

6         Q.   Yes.

7              MR. JOHNSON:  Well, object to -- I'm

8    gonna object to the form.

9         A.   The -- the little booklet that you just

10   kind of showed was -- was -- I believe that's the

11   Instructions For Use which comes with the -- the --

12   each -- each kit, and I already knew that -- the

13   information that I needed in order to perform an

14   informed consent.  I did not use that pamphlet for

15   doing that.

16        Q.   (BY MR. FARRELL)  Right.

17             But my question was:  Were you -- were

18   you familiar with the Instructions For Use?  You

19   indicated earlier that you believed you reviewed it

20   as part of your training in South Miami.

21             MR. JOHNSON:  Object to the form.

22        A.   I don't believe that particular manual

23   was -- that you're showing was part of the training

24   in South Florida.

Mark L. Lobaugh, M.D.

1                    When I -- when you said Instructions

2    For Use, I'm talking about instructions for using

3    the -- for the product, not necessarily that

4    pamphlet.

5        Q.   (BY MR. FARRELL)  What about the patient

6    brochure that you referenced earlier?  Was that a

7    source of information that you utilized when you

8    counseled Mrs. Dalberg regarding the surgery?

9        A.   No.  When I -- when I counsel patients for

10   this surgery, again, I'm using my training in

11   residency, my urogynecology training in residency,

12   my experience, reading the textbooks that I use, and

13   the training that I'm getting in these courses that

14   I go to.  All of that information together goes to

15   obtain the informed consent.

16       Q.   Did you offer Mrs. Dalberg any other

17   surgical options besides the Prolift® mesh?

18       A.   Yes.

19       Q.   What -- what were the other surgical

20   options that you offered?

21       A.   The traditional anterior repair.  I offer

22   that to -- to everybody.  I give them the option of

23   not using the mesh or using the mesh.

24       Q.   Did you offer any nonsurgical options?

Mark L. Lobaugh, M.D.

1        A.    I always offer physical therapy and I

2    always discuss pessary as therapeutic options for

3    pelvic prolapse.

4        Q.    Doctor, in order for you to be able to

5    counsel your patients on available options to treat

6    pelvic organ prolapse, is it important for you as

7    the implanting physician to be aware of all the

8    potential risks associated with the use of the

9    product that you're using to implant?

10       A.    Yes.

11              MR. JOHNSON:   Object to the form.

12       Q.    (BY MR. FARRELL)   And, Doctor, your --

13   your knowledge of all potential risks relating to a

14   specific product is part of the risks/ben- --

15   risk/benefit analysis that you provide to your

16   patients, correct?

17       A.    Correct.

18       Q.    Doctor, do you expect that a manufacturer

19   such as Ethicon would provide you with the

20   information that you would need to know in order to

21   understand all risks --

22              MR. JOHNSON:   Object --

23       Q.    (BY MR. FARRELL)   -- risks that are

24   inherent in using their product?

Mark L. Lobaugh, M.D.

1              MR. JOHNSON:  Object to the form.

2      A.   It's crucial that they give me that

3   information.

4      Q.   (BY MR. FARRELL)  Doctor, would you expect

5   for a manufacturer such as Ethicon to be completely

6   truthful with you about the risks associated with

7   their product that you're using?

8      A.   It's essential.  I mean, I rely on these

9   companies to provide me with the information that I

10  need to appropriately counsel my patients.  I mean,

11  there's just no other way I could get that

12  information.  I have to get it from the companies.

13              MR. FARRELL:  Let's go off the record

14  real quick so we can get the two exhibits I want to

15  use, please.

16              MR. JOHNSON:  Sure.  Could we take a

17  short break?

18              THE VIDEOGRAPHER:  Going off the

19  record.  Time is 3:54.

20              (A recess was taken from 3:54 p.m. to

21               4:04 p.m.)

22              THE VIDEOGRAPHER:  Back on the record.

23  Time is 4:04.

24              (Line intentionally left blank.)

Mark L. Lobaugh, M.D.

 1                    (Deposition Exhibit 13 marked for

 2                     identification.)

 3                    MR. FARRELL:  Could you please hand

 4     the doctor Exhibit 13, please.

 5                    MS. HARRIS:  He's got it.

 6                    MR. FARRELL:  Okay.

 7          Q.   (BY MR. FARRELL)  Doctor, Exhibit 13 is

 8     the Prolift® IFU or Instruction For Use that was in

 9     effect at the time of the surgery on Mrs. Dalberg.

10          A.   (Examined exhibit.)

11          Q.   Doctor, is this a document that you were

12     familiar with or you saw back when you were still

13     using the Prolift®?

14          A.   I'm sure I did.  I don't recall at this

15     point, but I'm sure this is the one that was given

16     to us.

17          Q.   Okay.  And this IFU booklet would be

18     included with every -- every box that had the

19     Prolift®; is that correct?

20          A.   Yes.

21          Q.   I just wanted to ask you a few -- few

22     questions about the document.

23                    If you'd go to page 2, please.

24          A.   (Complied.)

Mark L. Lobaugh, M.D.

1        Q.   There's a section headed "GYNECARE

2   GYNEMESH PS."

3             Were you aware that the trade name

4   internally of the Prolift® mesh was Gynemesh™ PS?

5        A.   No.

6        Q.   Okay.  If we could go down to the third

7   line under the "GYNECARE GYNEMESH PS," about the

8   middle of the line it sets out, "The mesh affords

9   excellent strength, durability, and surgical

10  adaptability, with sufficient porosity for necessary

11  tissue ingrowth."

12            Do you see that, what I just read,

13  Doctor?

14       A.   Yes.

15       Q.   Doctor, did you assume that for Ethicon to

16  make that statement that they would have had

17  clinical data to support that statement regarding

18  the Prolift® mesh?

19       A.   Yes.

20       Q.   Doctor, regarding sufficient porosity for

21  necessary tissue ingrowth, were you ever told that

22  Ethicon knew that the pores, due to their size,

23  could allow scar tissue to go across them and cause

24  something called fibrotic bridging and scar plating

Mark L. Lobaugh, M.D.

1    which would make the mesh rigid and hard?

2              MR. JOHNSON:  Object to the form.

3         A.   No.

4         Q.   (BY MR. FARRELL)  Doctor, if you had been

5    informed of that, would that have impacted your

6    decision as the implanting surgeon regarding whether

7    or not to use the Prolift® in your patients?

8              MR. JOHNSON:  Object to the form.

9         A.   It depends on what the significance of

10   that is.  That happens, but how significant is that?

11        Q.   (BY MR. FARRELL)  Okay.  Doctor, the last

12   line of that paragraph it sets out, "The

13   bi-directional elastic property allows adaptation to

14   various stresses encountered in the body."

15             Do you see that?

16        A.   Yes.

17        Q.   Doctor, did you presume that Ethicon had a

18   clinical data to support that claim?

19             MR. JOHNSON:  Object to the form.

20        A.   I would assume that anything they say in

21   their product would be backed up with some form of

22   evidence for them to make that statement, including

23   this one.

24        Q.   (BY MR. FARRELL)  And, Doctor, the fact

Mark L. Lobaugh, M.D.

1  that Ethicon claimed that the Prolift® mesh could

2  adapt to the stresses encountered in a woman's

3  pelvis, did that seem to be a good thing and

4  something that made the Prolift® a product that you

5  would want to use in your patients?

6             MR. JOHNSON:  Object to the form.

7      A.   Well, I'm not really sure exactly what

8  that means and what the significance of it is.

9             And I didn't necessarily rely on

10 this -- this pamphlet to help me decide whether or

11 not this was something I wanted to use for my

12 patients.

13     Q.   (BY MR. FARRELL)  Doctor, if you could

14 turn your attention, please, to Page Number 5 under

15 the heading "PERFORMANCE" towards the bottom.  It

16 sets out that, "Animal studies show that

17 implantation of GYNECARE GYNEMESH PS mesh elicits a

18 minimum to slight inflammatory reaction, which is

19 transient and is followed by a deposition of a thin

20 fibrous layer of tissue which can grow through the

21 interstices of the mesh, thus incorporating the mesh

22 into adja- -- adjacent tissue."

23             Do you see that, Doctor?

24     A.   Yes.

Mark L. Lobaugh, M.D.

1     Q.    Did you presume that Ethicon had clinical

2  data to support those statements and claims about

3  the mesh and how it would actually behave in use?

4     A.    Well, clinical data or some type of

5  laboratory data to -- for them to make the

6  assertion.

7              Again, anything they say in this

8  pamphlet, I would expect that they would have some

9  reason for saying this.

10    Q.    And with regards to the "minimum to slight

11 inflammatory reaction," do you believe that

12 information to be true?

13    A.    I do believe that there's an inflammatory

14 reaction caused by any foreign body placed in the --

15 in the body.

16    Q.    Okay.  Did Ethicon ever inform you that

17 they were aware that the mesh would not cause a

18 minimum to slight inflammatory reaction which is

19 transient in all patients, but that, in fact, they

20 knew that in all patients, the inflammatory reaction

21 would be ongoing, and for some patients the

22 inflammatory reaction would be severe?

23              MR. JOHNSON:  Object to the form.

24    A.    Some patients or all patients?

Mark L. Lobaugh, M.D.

1      Q.   (BY MR. FARRELL)   Some.

2      A.   No, Ethicon never informed me of that.

3      Q.   Doctor, would it be true that the -- the

4   body's foreign body response would be ongoing as

5   long as the foreign body mesh is still present?

6              MR. JOHNSON:   Object to the form.

7      A.   Well, not necessarily.  I mean, mesh is

8   used in many parts of the body for surgery and

9   there's not necessarily a continuing inflammatory

10  reaction.

11             I mean, mesh is used for abdominal

12  hernia repairs.

13             Mesh is used for sacrospinous

14  fixation.

15             We use mesh for laparoscopic Burch

16  procedures.

17             So it doesn't necessarily mean that

18  there's going to be an ongoing inflammatory

19  response.

20     Q.   (BY MR. FARRELL)   But there could be,

21  correct?

22             MR. JOHNSON:   Object to the form.

23     A.   There could be.

24     Q.   (BY MR. FARRELL)   And, Doctor, you saw the

Mark L. Lobaugh, M.D.

1    language regarding the thin fibrous layer of tissue,

2    correct?

3        A.   Correct.

4        Q.   And if that's a common awareness that for

5    some patients a thick hard layer of tissue would

6    grow across the mesh, which would cause pain and

7    other complications, would you have wanted to be

8    told that?

9            MR. JOHNSON:   Object to the form.

10       A.   Well, pain and complications is already a

11   known complication of -- of the mesh, and that's

12   already in the informed consent, and that's part of

13   the -- just the graft rejection is a rejection by an

14   inflammatory response or an immune rejection.

15            So I think -- you know, again, how

16   many patients?  Is it 40 percent or 60 percent?

17            My understanding was that it was an

18   unusual -- and in my experience, it was a very

19   unusual occurrence.

20       Q.   (BY MR. FARRELL)  But the language set out

21   in the IFU refers to a thin fibrous layer of tissue,

22   whereas they had knowledge that there would be, in

23   some patients, a thick hard layer of tissue that

24   would grow across the mesh.

Mark L. Lobaugh, M.D.

 1                    Is that something that you would have

 2    wanted to have known?

 3                    MR. JOHNSON:  Object to the form.

 4         A.   Well, I think I already did know it.  I

 5    mean, I already knew that that happened in some

 6    patients.

 7                    And, again, that's part of the

 8    informed consent for rejection of the -- the mesh

 9    and -- and scarring, which could potentially cause

10    pain and would potentially have to be removed.

11         Q.   (BY MR. FARRELL)  Doctor, there's the

12    statement that, "The mesh remains soft and pliable."

13                    (Phone interruption.)

14         Q.   (BY MR. FARRELL)  Do you see that?

15         A.   (Examined exhibit.)

16         Q.   Second-to-last sentence?

17         A.   Which page?

18         Q.   Page 5 still.

19         A.   Okay.  Yeah, I see it.

20         Q.   Did you assume that when Ethicon made that

21    statement regarding the mesh remaining soft and

22    pliable in actual use, did you believe that they had

23    clinical data to support that and that that was a

24    truthful statement?

Mark L. Lobaugh, M.D.

1      A.   Or laboratory.  Some -- some reason why

2   they can make that statement.  I would assume they

3   have -- whether it's laboratory or clinical.

4      Q.   Was it important to you that, according to

5   Ethicon, the Prolift® mesh would remain soft and

6   pliable in your patients' vaginal tissue?

7           MR. JOHNSON:  Object to the form.

8      A.   I mean, I'm not really sure that I ever

9   really thought about whether or not it remained soft

10  and pliable.

11     Q.   (BY MR. FARRELL)  Doctor, if you were

12  informed that, in fact, the mesh does not remain

13  soft and pliable, but in many patients can become

14  rigid and hard and as a result cause problems, would

15  that have been important to you to know?

16          MR. JOHNSON:  Object to the form.

17     A.   Well, again, I want to know what the --

18  what the frequency of that is, how often does that

19  happen, and why does it happen, and to be able to

20  let the patient know that this is a potential risk,

21  and as a result of that, may have to be removed.

22          But, again, the informed consent

23  already covers scarring and potential reaction and

24  potential removal.  So I felt like -- like the -- we

Mark L. Lobaugh, M.D.

1    were telling the patients that this is a

2    possibility, but a low possibility.

3                Now, if it turns out that it's a much

4    higher possibility and -- than -- than what -- what

5    we were -- what I was led to believe, then that

6    certainly is important information to know.

7        Q.   (BY MR. FARRELL)  Well, Doctor, if we can

8    turn your attention to page 6 under "Warnings and

9    Precautions."

10       A.   (Examined exhibit.)

11       Q.   The fourth bullet point sets out, "Avoid

12   placing excessive tension on the mesh implant during

13   handling."

14               Do you see that?

15       A.   Yes.

16       Q.   Were you ever provided with any

17   information from Ethicon regarding a quantification

18   for how much tension would be considered excessive

19   when you were implanting the Prolift® product?

20       A.   Well, we -- we kept it tension-free, so

21   there was no tension in the -- the arms of the mesh.

22               So basically, no tension was the

23   correct tension.

24       Q.   From the information that you received

Mark L. Lobaugh, M.D.

1   from Ethicon, was it your understanding that once

2   the mesh was implanted inside the body, there would

3   be some contraction and tension and that would

4   actually be a good thing that would help the

5   Prolift® operate properly?

6        A.   Yes.

7        Q.   Did anyone from Ethicon ever indicate to

8   you that they believed placing any tension on the

9   mesh once it was inside the body would actually be

10   reason to cause harm to the patient?

11             MR. JOHNSON:   Object to the form.

12        A.   No.

13        Q.   (BY MR. FARRELL)  Doctor, in reviewing the

14   IFU document, is there anything contained in the IFU

15   that describes or instructs the physician regarding

16   any surgical technique to be utilized if excision or

17   removal of the mesh is necessary?

18        A.   (Examined exhibit.)  In reviewing the

19   document, I do not see any.

20        Q.   Doctor, regarding any decision to

21   recommend surgery for excision or removal of the

22   Prolift® product, were you left to your own

23   judgment, based upon the fact that Ethicon provided

24   no instructions on the best way to remove the

Mark L. Lobaugh, M.D.

1    product, if necessary?

2         A.   Yes.

3         Q.   And if Ethicon had information in its

4    possession regarding the advisability of undertaking

5    an excision or removal surgery of the Prolift®,

6    would you have liked to have had that information

7    available to you?

8              MR. JOHNSON:  Object to the form.

9         A.   Yes.

10        Q.   (BY MR. FARRELL)  Was any information

11   regarding the effectiveness and risks of repair

12   surgery ever provided to you by Ethicon regarding

13   the Prolift®?

14        A.   Can you repeat the question?

15        Q.   Did Ethicon ever provide you with any

16   information regarding the effectiveness and risks of

17   repair surgery, excision surgery, relating to the

18   Prolift® product?

19        A.   No.  No.

20              (Deposition Exhibit 14 marked for

21               identification.)

22              MR. FARRELL:  Would you please hand

23   the doctor Exhibit 14.

24              MS. HARRIS:  You got it?

Mark L. Lobaugh, M.D.

1            THE WITNESS:  Uh-huh.

2            MS. HARRIS:  He's got it.

3       Q.   (BY MR. FARRELL)  Doctor, you made

reference earlier to being provided patient

brochures from the Ethicon representative that

interacted with you.

7            Do you recall that testimony?

8       A.   Yes.

9       Q.   Does Exhibit 14 look familiar to you

regarding a brochure that would have been provided

to you to pass on to your patients?

12      A.   No, it does not.  But I can't say this was

not one that they gave me.  It's just I -- I don't

remember.

15      Q.   I'll represent to you that this is one of

the brochures that was in circulation at the time of

your surgery upon Mrs. Dalberg in 2007.

18      A.   It's very likely, then, this is the one

that I would have used.

20      Q.   And, Doctor, I believe you indicated that

you did provide brochures to your patients; is that

correct?

23      A.   Correct.

24      Q.   And, Doctor, did you presume that these

Mark L. Lobaugh, M.D.

1    brochures that were provided to you by Ethicon would

2    include truthful and accurate information concerning

3    the Prolift® procedure?

4        A.   Yes.

5        Q.   And did you presume that Ethicon would be

6    providing fair and balanced information about the

7    Prolift®?

8        A.   Yes.

9        Q.   Meaning any positive asp- -- and negative

10   aspects for your patients?

11       A.   Well, I would like to say they would

12   pro- --

13               MR. JOHNSON:   Object to the form.

14       A.   I would like to say they would provide

15   honest information.

16       Q.   (BY MR. FARRELL)  Doctor, if I could

17   direct your attention to page 10 of the I- -- of the

18   patient brochure.

19       A.   (Complied.)

20       Q.   There is the heading where it says "What

21   is GYNECARE PROLIFT?"

22               Do you see that, Doctor?

23       A.   Yes.

24       Q.   And underneath it, it says -- or sets out,

Mark L. Lobaugh, M.D.

1    "A revolutionary surgical procedure using GYNECARE

2    PROLIFT employs a specially designed supportive soft

3    mesh placed in the pelvis to restore pelvic

4    support."

5                    Do you see that, Doctor?

6    A.   Yes.

7    Q.   When you see that information, did you

8    presume that Ethicon was providing truthful

9    information when they stated that the Prolift® used

10   a specially designed supportive soft mesh?

11                   MR. JOHNSON:   Object to the form.

12   A.   Yes.

13   Q.   (BY MR. FARRELL)   If we go to page 13,

14   Doctor.

15   A.   (Complied.)   Okay.

16   Q.   And under "What are the risks," it sets

17   out, "All surgical procedures present some --

18   present some risks.   Although rare, complications

19   associated with the procedure . . ." and it sets out

20   the complications.

21                   Do you see that, Doctor?

22   A.   Yes.

23   Q.   And when Ethicon made that representation

24   in the brochure that complications with the product

Mark L. Lobaugh, M.D.

1    were rare, did you believe that they were

2    representing truthful information based on all the

3    data that they had available to them?

4              MR. JOHNSON:  Object to --

5        A.   Yes.

6              MR. JOHNSON:  -- object to the form.

7        Q.   (BY MR. FARRELL)  And when Ethicon made

8    that statement regarding complications being rare,

9    did you presume that they had clinical data that

10   proved that to be a true statement?

11       A.   Yes.

12       Q.   Doctor, earlier you gave some testimony

13   relating to the Operative Report of August 29th,

14   2007, of Exhibit 9.

15             Do you recall that testimony?

16             (Phone interruption.)

17       A.   What exact- -- I don't recall the

18   testimony that I gave.

19       Q.   (BY MR. FARRELL)  Well, just -- you -- I

20   believe you indicated, correct me if I'm wrong, that

21   you had the opportunity to read over the Operative

22   Report as part of your preparation for today's

23   deposition?

24       A.   Yes.

Mark L. Lobaugh, M.D.

1       Q.   Okay.  And based upon your review of the

2   report, were there any complications during your

3   surgical procedure with Mrs. Dalberg?

4       A.   I did not notice any complications in the

5   report.  So, no, I didn't see any.

6       Q.   And after having reviewed your Operative

7   Report and with the information that's contained

8   within the Instructions For Use, do you believe that

9   you performed the Prolift® implantation surgery

10  correctly on August 29th, 2007?

11      A.   Yes.

12           MR. FARRELL:  All right, Doctor.

13  That's all the questions I have for now.

14           I'll reserve the remainder of my time.

15  Thank you.

16           MR. JOHNSON:  Let's go off the record.

17           THE VIDEOGRAPHER:  Going off the

18  record.  Time is 4:26.

19           (A recess was taken from 4:26 p.m. to

20            4:31 p.m.)

21           THE VIDEOGRAPHER:  Back on the record.

22  Time is 4:31.

23           (Deposition Exhibit 15 marked for

24            identification.)

Mark L. Lobaugh, M.D.

```
 1                   FURTHER EXAMINATION

 2   BY MR. JOHNSON:

 3       Q.   Doctor, could you take a look at what

 4   we've marked as Exhibit Number 15, which is a

 5   June 5th, 2012, letter from Ethicon to healthcare

 6   providers?

 7       A.   Okay.

 8       Q.   Do you know whether you've seen that

 9   letter before?

10       A.   I may have.

11       Q.   There was reference by counsel that

12   somehow the Prolift® was, quote, "pulled off the

13   market," end quote, and I'd like for you to take

14   a look at --

15               MR. FARRELL:  Form.

16       Q.   (BY MR. JOHNSON)  -- the third paragraph

17   of Exhibit Number 15 and read that to yourself.

18       A.   Okay.

19               MR. FARRELL:  Objection to form.

20       Q.   (BY MR. JOHNSON)  Looking at the third

21   paragraph, does -- what does that indicate to you as

22   to whether or not Ethicon made a decision to stop

23   selling the product, decommercialize the product?

24       A.   What's the question?
```

Mark L. Lobaugh, M.D.

1        Q.   Does -- and also, if you could take a look

2   at the fifth paragraph.

3        A.   Okay.

4        Q.   Could you just read the first two

5   sentences of the fifth paragraph of the letter.

6        A.   "We want to emphasize that we continue to

7   have confidence" --

8             MR. FARRELL:  Objection.

9        A.   -- "in the safety and efficacy of these

10  products.  This is not a product recall."

11       Q.   (BY MR. JOHNSON)  And then in look- --

12  having looked at the third paragraph as well, does

13  it appear that the company made a decision to

14  decommercialize their product or just stop selling

15  it?

16       A.   Yeah, it seems like it was a commercial

17  decision.

18             MR. FARRELL:  Objection to form.

19       Q.   (BY MR. JOHNSON)  All right.  Is there

20  anything in that letter that you've had a chance to

21  review that indicates to you that this was somehow

22  pulled off the market?

23       A.   No.

24             (Deposition Exhibits 6 - 12

Mark L. Lobaugh, M.D.

1                    referenced.)

2        Q.   (BY MR. JOHNSON)  Doctor, if you could

3   take a look at records, pages -- or numbers --

4   Exhibits 6 through 12.  I think you've already had a

5   chance to look at them.  You probably don't have to

6   look at them again.  I just want to authenticate

7   these records.

8        A.   (Examined exhibit.)

9        Q.   Do the Exhibits 6 through 12, which are

10   the medical records, appear to be true and correct

11   copies of medical records pertaining to your care

12   and treatment of Ms. Dalberg in late August, early

13   September 2007?

14        A.   Yes.

15        Q.   Do you have any reason to believe these

16   records are unreliable?

17        A.   No.

18        Q.   Are these records that would have been

19   maintained -- kept and maintained by the hospital in

20   the ordinary course --

21        A.   Yes.

22        Q.   -- of their business?

23        A.   Yes.

24        Q.   And are there records that you've made

Mark L. Lobaugh, M.D.

1    entries on, records in which the entries were made

2    at or about the time of the occurrence?

3         A.   Yes.

4         Q.   All right.  There was a question by

5    counsel about the need to have the Prolift® mesh lie

6    flat in the abdomen when it was placed.

7         A.   In the abdomen or vagina?

8         Q.   In -- well, in the vagina -- strike that.

9              Let me ask you the question.

10             When you placed the -- the Prolift®

11   during the pelvic organ prolapse surgery, did you

12   lie it flat?

13        A.   Yes.

14        Q.   And why did you do that?

15        A.   Well, I just -- again, I'm trying to

16   recreate that tent to hold the rectum in place or

17   recreate the hammock to hold the bladder in place,

18   so you want it flat.

19        Q.   You mentioned that you had stopped using

20   the Prolift® and then started using a Boston

21   Scientific product.

22        A.   Well, I went from -- I've used AMS.  I use

23   Boston Scientific.  I kind of experimented with all

24   of them.

Mark L. Lobaugh, M.D.

1      Q.   And my question is:  Did you stop using

2   the Prolift® because of concerns you had regarding

3   safety or effective- -- effectiveness of that

4   product?

5      A.   No.

6      Q.   Then I don't know if counsel mentioned

7   this or -- I just want to make sure that the

8   record's clear.

9           The company produced information

10  regarding training -- to -- to plaintiffs' counsel

11  regarding trainings that you had with respect to

12  their products.

13     A.   Okay.

14     Q.   And he referenced the training you had in

15  March of 2007 at -- at South Miami.

16     A.   Um-hum.

17     Q.   And he referenced the training at

18  Metroplex Hospital in May of 2007.

19     A.   Um-hum.

20     Q.   According to the information we provided

21  to plaintiffs' counsel, you also had training in

22  TVT® and TVT-O in May of 2002 in Overland Park.

23     A.   Yes.

24     Q.   Do you recall that?

Mark L. Lobaugh, M.D.

1      A.   Yes.

2      Q.   At Overland Park Regional Hospital?

3      A.   Yes.

4      Q.   When you had that training, did you --

5  could you tell the jury what kind of training you

6  received when you had the TVT-O and TVT® training,

7  and tell them what that means?

8      A.   Well, back -- again, generally speaking,

9  it included a didactic session discussing the -- the

10 benefits of the mid-urethral sling and discussed the

11 insertion of it and probably had some instructional

12 videos.

13           And then following that, there was

14 probably some kind of cadaver lab where we actually

15 went in and got hands-on experience in placing the

16 TVT®.

17     Q.   Does TVT® stand for tension-free vaginal

18 tape?

19     A.   Transvaginal tape.

20     Q.   All right.  And then after 2000 -- after

21 that training that you had in the TVT® and TVT-O in

22 2002, did you start putting in Ethicon mid-urethral

23 slings?

24     A.   I didn't really start doing the TVT® for a

Mark L. Lobaugh, M.D.

1    while after that because it really wasn't widely --

2    it wasn't used widely where I was at.  And the

3    initial practice that I was at -- I was at when I

4    went to that course, the urologists were doing all

5    of the sling procedures.

6              So although I had wanted to use it,

7    it -- I wasn't in a situation where it was part of

8    my practice at that point.

9        Q.   At some point in time, did you use the TVT®

10   and TVT-O manufactured by Ethicon?

11       A.   Yes.

12       Q.   Approximately how many of those slings did

13   you put in?

14       A.   I did a lot of slings.  Almost every time

15   we did a vaginal vault reconstruction, it included a

16   TVT® or TOT.

17       Q.   Doctor, when we take a look at the consent

18   form that you prepared, which is the Exhibit

19   Number 7, and specifically the last two pages of

20   Exhibit Number 7, the Pelvic Reconstruction Consent,

21   those two pages are pages that you -- you and your

22   office prepared; is that right?

23       A.   Correct.

24       Q.   My question --

Mark L. Lobaugh, M.D.

1              MR. FARRELL:  Objection.

2       Q.   (BY MR. JOHNSON)  My question is:  How did

3    you go about preparing your own consent form that's

4    represented in this Pelvic Reconstruction Consent?

5              MR. FARRELL:  Objection.

6       A.   This consent form, I believe, was given to

7    me from one of the courses that I attended, and so

8    I -- I essentially took the consent form that was

9    being used by one of the universities and sort of

10   modified it to -- tailored it to our needs, our

11   specific needs.

12      Q.   (BY MR. JOHNSON)  Did you rely on the IFU

13   regarding Prolift® at all in preparing this consent

14   form?

15      A.   No.

16      Q.   You mentioned that -- or strike that.

17              I think you mentioned that you noted

18   that your practice, you were getting a higher rate

19   of exposure with mesh products than the rate that

20   you'd been told?

21      A.   Higher rate of erosions.

22      Q.   Okay.  Erosions.

23              And my question is:  In your clinical

24   experience, did you think that you were getting a

Mark L. Lobaugh, M.D.

1    higher rate of erosions with the Prolift® as opposed

2    to the other meshes?

3         A.   No.

4         Q.   What was the -- what was the rate that

5    you -- when you first started using the products,

6    meshes of all kinds from different companies, what

7    was the exposure rate that you -- or erosion rate

8    you were expecting?

9         A.   You know, I can't remember.  I --

10              MR. FARRELL:  Objection.

11        A.   -- I think it was around 5 percent, and I

12   felt like I was seeing a lot more than that.

13        Q.   (BY MR. JOHNSON)  And were you able to put

14   a percentage on how much more you were seeing?

15        A.   I think I was seeing around 20 percent.

16   So -- and a lot of them were very minor, and it

17   just -- it just took a little bit of trimming and

18   then re- -- and then closing up the -- the vaginal

19   tissue over the trim, and that seemed to take care

20   of it.

21              But it did seem like it was, in my

22   mind, higher than what was being broadcasted to me

23   by the -- by the products.

24        Q.   These erosions that you're -- that you saw

Mark L. Lobaugh, M.D.

1   through the vaginal tissue, were they related to --

2   mainly to TV- -- to the mid-urethral slings or to

3   the mesh used for pelvic organ prolapse?  Was one

4   more prominent?

5       A.   Very rarely --

6              MR. FARRELL:  Objection.

7       A.   -- did I see an erosion from the

8   mid-urethral slings.  That was a very uncommon

9   event.

10             It was more of the posterior.  It

11  seemed to be the posterior repair which had more of

12  the erosions.

13      Q.   (BY MR. JOHNSON)  All right.  Doctor, if

14  you could take a look at Exhibit 14 again, which is

15  the patient brochure.

16      A.   (Examined exhibit.)

17      Q.   As you sit here today, are you able to say

18  under oath that that specific brochure was available

19  in your office at the time that Ms. Dalberg would

20  have been getting her informed consent?

21      A.   I cannot say that.

22      Q.   All right.  Doctor, just in wrapping up,

23  did you believe -- or strike that.

24             What was your belief as to the

Mark L. Lobaugh, M.D.

1    clinical experience that your patients generally had

2    with Prolift®?

3        A.   Generally --

4             MR. FARRELL:  Objection.

5        A.   -- I thought it was a favorable

6    experience.  I thought most of the patients were --

7    were happy with the procedure and most of the

8    patients got benefit from it.

9        Q.   (BY MR. JOHNSON)  Did you draw any

10   conclusions as to whether or not patients had

11   improved quality of life after having the Prolift®

12   surgery for their prolapse?

13       A.   I felt -- I felt like --

14             MR. FARRELL:  Objection.

15       A.   -- most of them did.

16       Q.   (BY MR. JOHNSON)  And then when you -- at

17   the time that you implanted the Prolift® mesh into

18   Ms. Dalberg, was it your belief that the benefits

19   outweighed the risks?

20       A.   Yes.

21             But that wasn't my decision.  It was

22   the patient's decision, and the patient had to make

23   that decision for themself.

24             And, you know, we -- again, we

Mark L. Lobaugh, M.D.

1    discussed the risks and the benefits.  She had

2    already had one repair, traditional repair, that

3    failed.

4                   So, I mean, these were her options --

5    any patient's options, and they ultimately have to

6    make that decision.  It really doesn't matter what I

7    think.  It's really what they decide for their own

8    personal healthcare.

9        Q.    In your hands, Doctor, do you have an

10   opinion whether the Prolift® was safe and effective

11   for the treatment of pelvic organ prolapse in your

12   patients?

13                   MR. FARRELL:  Objection.

14       A.    I don't really have an opinion on that

15   because, again, that's beyond -- that -- that type

16   of question has to be studied by people who do these

17   studies, and they have to come up with the answers

18   on those.

19                   I felt the product was a reasonable

20   way to take care of the problem, and I used the

21   product and I thought it was a good concept, and it

22   doesn't seem to have worked out because it's not

23   available anymore, and my only -- my only conclusion

24   is that with clinical experience, they have shown

Mark L. Lobaugh, M.D.

1    that it's not safe to use anymore, and that's why

2    it's not used anymore.

3        Q.   (BY MR. JOHNSON)  Do you have any

4    knowledge to support the state- -- the statement

5    that the Prolift® is not safe to use, any clinical

6    data?

7        A.   The -- no.  The only -- again, I'm not

8    gonna analyze all ten papers that are out there.

9             But the -- the academicians who are

10   looking at this and making their recommendations

11   have said -- have come out and said, based on that

12   FDA -- and as -- by that FDA recommendation, that

13   it's not to be the first choice.  It's to be used in

14   certain situations, so . . .

15       Q.   All right.

16            MR. JOHNSON:  Thank you.  That's all

17   the questions that I have, Doctor.

18            MR. FARRELL:  I have no further

19   questions.  Thank you.

20            THE VIDEOGRAPHER:  This concludes the

21   deposition of Dr. Mark Lobaugh.  Going off the

22   record.  Time is 4:45.

23            (Off the video record.)

24            MR. JOHNSON:  Thanks, Doctor.

Mark L. Lobaugh, M.D.

```
 1                    THE COURT REPORTER:  Would you like

 2     the Doctor to read and sign?

 3                    MS. HARRIS:  Yes.  And you can send

 4     the original to me, and I'll get it to him.

 5

 6                    (Deposition concluded at 4:45 p.m.,

 7                     September 26, 2018.)

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Mark L. Lobaugh, M.D.

```
 1                  CHANGES AND SIGNATURE

 2   WITNESS NAME:  MARK L. LOBAUGH, M.D.

 3   DATE:  DATE, 2018

 4   PAGE/LINE      CHANGE                    REASON

 5   _____

 6   _____

 7   _____

 8   _____

 9   _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24   _____
```

Mark L. Lobaugh, M.D.

```
 1        I, MARK L. LOBAUGH, M.D., have read the

 2   foregoing deposition and hereby affix my signature

 3   that same is true and correct, except as noted

 4   above.

 5


 6                    _____


                         MARK L. LOBAUGH, M.D.

 7

     THE STATE OF _____)

 8

     COUNTY OF _____)

 9

10        Before me, _____, on

11   this day personally appeared MARK L. LOBAUGH, M.D.,

12   known to me (or proved to me under oath or through

13   _____) (description of

14   identity card or other document) to be the person

15   whose name is subscribed to the foregoing instrument

16   and acknowledged to me that they executed the same

17   for the purposes and consideration therein

18   expressed.

19        Given under my hand and seal of office this

20   _____ day of _____, 2018.

21

22                         _____

23                         NOTARY PUBLIC IN AND FOR

24                         THE STATE OF _____
```

```
 1              UNITED STATES DISTRICT COURT
            SOUTHERN DISTRICT OF WEST VIRGINIA
 2                    AT CHARLESTON
 3     _____
 4     IN RE: ETHICON, INC.,      )  Master File No.
       PELVIC REPAIR SYSTEM       )  2:12-MD-02327
 5     PRODUCTS LIABILITY         )
       LITIGATION,                )  MDL No. 2327
 6                                )
                                  )  HON. JOSEPH R. GOODWIN,
 7                                )  U.S. DISTRICT JUDGE
                                  )
 8     _____  )  _____
                                  )
 9     REBECCA DALBERG, ET AL,    )
                                  )
10          Plaintiffs,           )
                                  )  Case No.: 2:13-cv-09725
11     v.                         )
                                  )
12     ETHICON, INC., ET AL.,     )
                                  )
13          Defendants.           )
       _____
14
15
16              REPORTER'S CERTIFICATE
17     -----------------------------------------
18        DEPOSITION OF MARK L. LOBAUGH, M.D.
19                TAKEN DATE, 2018
20     -----------------------------------------
21
22        I, Karen L. D. Schoeve, Certified Shorthand
23     Reporter, Registered Diplomate Reporter, Certified
24     Realtime Reporter, and Realtime Systems
```

Mark L. Lobaugh, M.D.

1   Administrator, residing in the State of Texas, do

2   hereby certify that the foregoing proceedings were

3   reported by me and that the foregoing transcript

4   constitutes a full, true, and correct transcription

5   of my stenographic notes, to the best of my ability

6   and hereby certify to the following:

7        That the witness, MARK L. LOBAUGH, M.D., was

8   duly sworn by the officer and that the transcript of

9   the oral deposition is a true record of the

10   testimony given by the witness;

11        That the original deposition was delivered to

12   JEFFREY R. JOHNSON, custodial attorney;

13        That a copy of this certificate was served on

14   all parties and/or the witness shown herein on

15   _____.

16        I further certify that pursuant to FRCP No.

17   30(f)(i) that the signature of the deponent was

18   requested by the deponent or a party before the

19   completion of the deposition and the signature is to

20   be returned within 30 days from date of receipt of

21   the transcript.

22        If returned, the attached Changes and

23   Signature Page contains any changes and the reasons

24   therefore;

Mark L. Lobaugh, M.D.

```
1        I further certify that I am neither counsel

2   for, related to, nor employed by any of the parties

3   in the action in which this proceeding was taken,

4   and further that I am not financially or otherwise

5   interested in the outcome of the action.

6            Subscribed and sworn to on this the 10th

7   day of October, 2018.

8

9

10

11   _____

     Karen L. D. Schoeve, CSR, RDR, CRR

12   Realtime Systems Administrator

     NCRA Certification Exp. 09/30/18

13   Golkow Litigation Services

     Firm Registration No. 690

14   One Liberty Place

     1650 Market Street, Suite 5150

15   Philadelphia, Pennsylvania 19103

     T:  877.370.3377

16   F:  917.591.5672

     www.golkow.com

17

18

19

20

21

22

23

24
```